# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF OHIO

## WESTERN DIVISION

| | | |
|---|---|---|
| TYLER GISCHEL, | ) | |
| 2683 HUFFMAN ROAD | ) | CIVIL ACTION NO. 1:17 CV 475 |
| CENTERBURG, OHIO 43011 | ) | |
| | ) | JUDGE: |
| PLAINTIFF, | ) | |
| | ) | MAGISTRATE |
| V. | ) | |
| | ) | |
| UNIVERSITY OF CINCINNATI | ) | |
| 2500 CLIFTON AVENUE | ) | |
| CINCINNATI, OHIO 45220 | ) | |
| | ) | |
| DANIEL CUMMINS | ) | |
| STRATFORD HTS. Bldg.21 | ) | |
| 2634 STRATFORD AVE | ) | |
| CINCINNATI, OH 45220-0638 | ) | |
| | ) | |
| WILLIAM RICHEY | ) | |
| EDWARDS CENTER | ) | |
| 51 CORRY BLVD #3 | ) | |
| CINCINNATI, OH 45221 | ) | |
| | ) | |
| JYL SHAFFER | ) | |
| MONTANA STATE UNIVERSITY | ) | **COMPLAINT AND** |
| OFFICE OF INSTITUTIONAL EQUITY | ) | **JURY DEMAND** |
| 114 HAMILTON HALL | ) | |
| BOZEMAN, MT 59717-2430 | ) | |
| | ) | |
| BRICE MICKEY | ) | |
| STEGER 671 | ) | |
| 2801 UC MAIN STREET | ) | |
| CINCINNATI OH 45221-0136 | ) | |
| | ) | |
| CAROL TONGE MACK | ) | |
| 7140D EDWARDS 1 | ) | |
| EDWARDS CENTER | ) | |
| 45 W. CORRY BLVD | ) | |
| CINCINNATI, OH 45221 | ) | |

ARNETT GLASSCO                              )
OLD CHEM 620H                              )
2855 CAMPUS WAY                            )
CINCINNATI, OH 45221-0070; and            )
                                          )
RACHEL J. SMITH, ESQ.                     )
UC COLLEGE OF LAW  413                     )
2540 W CLIFTON AVENUE                      )
CINCINNATI, OH 45221-0040                 )
                                          )
        DEFENDANTS.                        )

# COMPLAINT

1.  Plaintiff Tyler Gischel ("Gischel"), by and through his attorneys, complains as follows

    against the Defendants below who, among other things, violated Gischel's constitutional

    and Title IX rights by discriminating against Gischel on the basis of his male gender as

    detailed in part by the direct and Indirect Gender Bias Evidence[1]  detailed in this

    Complaint:

    (a)     Defendant University of Cincinnati ("UC");
    (b)     Defendant Jyl Shaffer (Shaffer), UC's former Title IX Coordinator and investigator
            for the Title IX complaint filed with the Title IX Office by Jennifer Schoewe
            ("Schoewe") against Gischel;
    (c)     Defendant William Richey (Richey), UC Police Department Detective ("UCPD")
    (d)     Defendant Daniel Cummins (Cummins), UC's Assistant Dean of Students and
            Director of Office of Judicial Affairs ("OUJA");
    (e)     Defendant Brice Mickey ("Mickey") is Program Coordinator in the Student
            Activities & Leadership Development Office at UC and served as the Chair of the
            Administrative Review Committee ("ARC") panel which heard Schoewe's case
            and unlawfully sanctioned Gischel;
    (f)     Carol Tonge Mack ("Tonge Mack"), is the Director of Student Retention Initiatives
            at UC and served on the ARC panel overseeing Gischel's hearing;

---

[1] The terms "Indirect Gender Bias Evidence," "Indirect Gender Bias Manifestations" and/or Indirect Gender Bias Motivations" are used in this Complaint refers to statements and/or conduct from which at least the following inferences can be drawn: (1) a primary advocacy on behalf of females who allege males engaged in sexual misconduct; (2) minimal or no advocacy on behalf of males who are alleged to have engaged in sexual misconduct towards females; (3) minimal or no advocacy for protecting females from sexual misconduct perpetrated by other females; and/or (4) minimal or no advocacy for protecting males from sexual misconduct perpetrated by females.

     (g)     Arnett Glassco ("Glassco") is the Senior Academic Director at UC and served as one of the faculty members of the ARC panel;

     (h)     Rachel J. Smith ("Smith") is a professor at the UC College of Law and at all relevant times served as the University Appeals Administrator who reviewed and ultimately denied Gischel's appeal;

     (i)     Defendants UC, Shaffer, Cummins, Richey, Mickey, Tonge Mack, Glassco and Smith are collectively referred to as ("State Defendants"). Defendants Shaffer, Cummins, Richey, Mickey, Glassco, Smith and Tonge-Mack are collectively referred to as ("Individual Defendants").

## §1: <u>NATURE OF THE ACTION</u>

2. As detailed more fully below, State Defendants' gender bias violated UC's policies, procedures, and practices, collectively known as UC Policies[2] and Gischel's due process and Title IX rights, in part, by erroneously disciplining Gischel even though State Defendants knew Schoewe falsely accused Doe of engaging in sexual misconduct.

3. State Defendants' conduct is part of a troubling trend among American universities which force male students to pursue litigation to clear their names and continue to pursue their educational and life goals.[3] Although some females making false allegations of sexual assault are criminally prosecuted and sentenced to jail,[4] America's universities rarely discipline females who bring these types of false allegations.

4. Lawsuits seeking to remedy a university's gender-biased application of Title IX policies sometimes come too late. For example, the parents of a male student who committed

---

[2] "UC Policies" include, but are not limited to, the Student Code of Conduct ("SCOC" *Exhibit 1,* pp. 1-30), Title IX: Preventing Sexual Harassment and Discrimination , *Id.,* pp. 33-36, Title IX: Policies and Procedures, *Id.* pp.37-48, Policy Statement on Sexual Offenses, *Id.* pp. 49-55, and Resource Guide for Student Survivors of Sexual Assault ("Resource Guide"), *Id.* pp. 56-80.

[3] *See generally, Stop Abusive and Violent Environments' Oct. 2016 Special Report: Victim-Centered Investigations: New Liability Risk for Colleges and Universities* (detailing how thirty lawsuits filed by plaintiffs accused of sexual misconduct resulted in judicial decisions which at least partially favored the plaintiffs in claims against their universities). Available at http://www.saveservices.org/wp-content/uploads/Victim-Centered-Investigations-and-Liability-Risk.pdf. (accessed 6/22/17).

[4] *See e.g.,* Joshua Miller, *Teen Charged with Lying about being raped by college football player,* New York Post, http://nypost.com/2017/02/22/teen-charged-with-lying-about-being-raped-by-college-football-players. (accessed 6/22/17).

suicide recently filed suit against the university their son attended for mishandling a Title

IX proceeding. *See*, Ashe Schow, *Texas Student Commits Suicide after Title IX Kangaroo*

*Court*, Texas BureauWatchdog.org,

http://watchdog.org/292821/maleaccusedstudentcommitssuicideschoolrailroading /

(accessed 6/22/17).

5. The lawsuits filed by male students often trigger hostile reactions which Brown Univ.

discussed by noting:

" . . . . the Court is an independent body . . . [that] cannot be swayed by emotion or
public opinion. After issuing the preliminary injunction this Court was deluged with
emails resulting from an organized campaign to influence the outcome. These
tactics, while perhaps appropriate and effective in influencing legislators or
officials in the executive branch, have no place in the judicial process. This is basic
civics, and one would think students and others affiliated with a prestigious Ivy
League institution would know this. Moreover, having read a few of the emails, it
is abundantly clear that the writers, while passionate, were woefully ignorant about
the issues before the Court. Hopefully, they will read this decision and be
educated." *Doe v. Brown Univ.,* Case No. 16–017 S, 2016 WL 5409241 (D.R.I.
Sept. 28, 2016).

6. Like the male students who came before him, State Defendants left Gischel no other option

but to seek damages and injunctive relief to remedy emotional, mental, economic, and

physical harm caused by State Defendants. Gischel's causes of action include declaratory

judgment, violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681,

et seq., 42 U.S.C. §1983, and violations of the Fifth and Fourteenth Amendments to the

United States Constitutions and §16 of the Ohio Constitution.

7. Individual Defendants violated the Fifth and/or Fourteenth Amendments to the United

States Constitutions, which provide that no person shall be deprived of life, liberty, or

property without due process of law. Similarly, Individual Defendants violated the Ohio

Constitution §16 which guarantees that every person injured in his person, property or

reputation have remedy by "due course of law." The Due Process clauses of the Ohio and United States Constitutions are implicated by higher education disciplinary decisions.

8. State Defendants violated UC policies by improperly and unlawfully applying and/or breaching those policies and/or the implied covenant of good faith and fair dealing inherent in these policies.

9. This Court has jurisdiction over this action by virtue of federal question jurisdiction pursuant to 28 U.S.C. §1331 and the protection of civil rights pursuant to 28 U.S.C. §1343.

10. This Court has personal jurisdiction over Defendants on the grounds that Defendants reside and/or conduct business within the State of Ohio.

11. Venue rests with this Court pursuant to 28 U.S.C. §1391 and Southern District Civil Rule 82.1 because a substantial part of the events or omissions giving rise to the claims occurred in its judicial district.

## §2: STATE DEFENDANTS' ANTI-MALE GENDER BIAS MOTIVATED VIOLATIONS UC'S POLICIES AND GISCHEL'S DUE PROCESS AND TITLE IX RIGHTS

12. State Defendants' violations of UC Policies and Gischel's due process and Title IX rights were motivated by animus towards male students like Gischel which is demonstrated, in part, in the direct and Indirect Gender Bias Evidence detailed in this Complaint.

13. Upon information and belief,[5] widespread anti-male bias exists at UC in part because of an April 11, 2011 "Dear Colleague" letter issued by the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") which instructed how colleges and

---

[5] It should be noted, the "information and belief" allegations in the Complaint are based on at least the following two factors: (1) the evidence referenced and/or exhibits attached to the Complaint which provide a plausible basis for Gischel's "information and belief" allegations; and (2) Gischel believes Defendants are in possession and/or control of additional evidence supporting Gischel's "information and belief" allegations and Gischel believes he will obtain this evidence in discovery.

universities must investigate and resolve complaints of sexual misconduct under Title IX. ("2011 Dear Colleague Letter") (available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (accessed 6/22/17).

14. The 2011 Dear Colleague Letter manifests direct and/or Indirect Gender Bias Evidence in part by equating complainants in sexual misconduct proceedings as being females who must receive preferential treatment. For instance, the 2011 Dear Colleague Letter:

(a) Incorrectly[6] states: "'1 in 5 *women* are victims of completed or attempted sexual assault while in college' . . . [t]he Department is deeply concerned about this problem . . . ." 2011 Dear Colleague Letter, p. 2 (Emphasis added);

(b) Warns that "the majority of campus sexual assaults occur when *women* are incapacitated, primarily by alcohol." *Id*. (Emphasis added);

(c) Suggests educational institutions seek grants from the U.S. Department of Justice's Office on Violence against *Women* which require institutions "develop victim

---

[6] As discussed in this Complaint, UC and President Obama's administration's often-repeated allegation that "1 in 4" or "1 in 5" female college students are sexually assaulted is unsupported. For example, a report issued by The American Association of University Women noted that over 90% of the colleges and universities in the United States reported *none* of their students were raped in 2014. *See,* American Association of University Women, *91 Percent of Colleges Reported Zero Incidents of Rape in 2014,* (Nov. 23, 2015) http://www.aauw.org/article/clery-act-data-analysis/ (accessed 6/26/17). Similarly, a "special report from the Bureau of Justice Statistics titled 'Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013' . . . found . . . females college . . . are less likely to be victims of sexual assault than their peers who are not enrolled in college. The report found . . . the incidence [of sexual assault] . . . was far lower than anything approaching 1 in 5: 0.76 percent for nonstudents and 0.61 percent for students." Emily Yoffe, *The Problem with Campus Sexual Assault Surveys*, SLATE, Sept. 24, 2015. *http://www.slate.com/articles/double_x/doublex/2015/09/aau_campus_sexual_assault_survey_why_such_surveys_d on_t_paint_an_accurate.html* (accessed 6/22/17). In addition, academics conducting a research study found approximately 50% of sexual assault allegations at two Midwestern American colleges were false. *See,* Eugene J. Kanin, *False Rape Allegations* Archives of Sexual Behavior, Vol. 23 No.1 (1994) available https://archive.org/details/FalseRapeAllegations (accessed 6/22/17). Another academic paper exposed the lack of objective proof behind a "consensus among legal academics that only two percent" of sexual assault allegations are false. *See,* Edward Greer, *The Truth behind Legal Dominance Feminism's Two-Percent False Rape Claim Figure,* 33 Loy. L.A.L. Rev. 947(2000); available http:_digitalcommon.lmu.edu/llr_/vol33/iss_3/3 (accessed 6/26/17) Issues such as these are addressed in detail in Stuart Taylor Jr. and KC Johnson's recent book *The Campus Rape Frenzy: The Attack on Due Process at America's Universities.* The rationale behind some of the false allegations is detailed in an academic research paper which reviewed multiple academic studies. *See,* Reggie D. Yager, *What's Missing From Sexual Assault Prevention and Response*, (April 22, 2015) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2697788 (accessed 6/22/17). This paper determined a high percentage of sexual assault allegations are false and based on the alleged victims': (1) need for a cover story or alibi; (2) retribution for a real or perceived wrong, rejection or betrayal; and/or (3) desire to gain sympathy or attention. *Id.*

service programs and campus policies that ensure victim safety, [and] offender accountability. . . ." *Id*., p.19 (Emphasis added);

(d)     Warns education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs." In fact, OCR asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs. *Id*. p.15; and

(e)     Shifts the burden of proof on males accused of sexual misconduct by requiring colleges to: "minimize the burden on the complainant." *Id*. p.15-16.

15. The 2011 Dear Colleague Letter manifests direct and/or Indirect Gender Bias Motivations by making it more difficult for males accused of sexual misconduct to defend themselves. For example, the 2011 Dear Colleague Letter required schools adopt the lowest burden of proof - "more likely than not" - in cases involving sexual misconduct. Several colleges had been using "clear and convincing" and some, like Stanford, applied the criminal standard, "beyond a reasonable doubt."

16. Similarly, on April 29, 2014, OCR published a document signed by OCR's then Asst. Sec. of Ed. Catherine E. Lhamon ("Sec. Lhamon") titled "Questions and Answers on Title IX and Sexual Violence" ("OCR's 2014 Q&A") (available at http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (accessed 6/22/17). This OCR directive manifests direct and/or Indirect Gender Bias Motivations, in part, because it hampered the accused student's ability to defend himself by reducing or eliminating the ability to expose credibility flaws in the allegations made against him. For example, OCR's 2014 Q&A states schools:

(a)     "[M]ust not require a complainant to be present" at sexual misconduct disciplinary hearings. OCR's 2014 Q&A, p.30;

(b)     May decide to eliminate all opportunities for "cross-examination." *Id*., p.31; and

(c)     Must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event." *Id.*, pp. 30, 38.

17. Neither OCR's 2014 Q&A nor the 2011 Dear Colleague Letter were subject to notice-and-comment rulemaking, and therefore their validity as binding law is at best questionable. Thus, Senator James Lankford wrote to the DOE on January 7, 2016 to express his concerns that the DOE's Dear Colleague letters are not interpretive, but are unlawfully altering the regulatory and legal landscape of Title IX and the U.S. Constitution. *See, Exhibit 2* (containing Senator Lankford's Jan. 7, 2016 letter to ODE Acting Secretary John King).

18. Following Senator Lankford's letter, Representative Earl Ehrhart from Georgia filed a lawsuit against DOE on April 21, 2016 in the United States District Court for the Northern District of Georgia alleging that the DOE's implementation of the 2011 Dear Colleague letter was unconstitutional and unlawful. See http://www.saveservices.org/wp-content/uploads/Ehrhart-v.-DOE-2016.pdf (accessed 6/22/17).

19. Similar allegations were made against DOE in the federal lawsuit *Doe v. Lhamon et al.*, which was filed in United States District Court for the District of Columbia. *See*, *Exhibit 3* (containing *Doe v. Lhamon et al.*, Complaint). This Complaint details OCR's direct and/or Indirect Gender Bias Motivations which include, but are not limited to, evidence of OCR pressuring colleges, around the county, to make it more difficult for male students accused of sexual misconduct to defend themselves.

20. Upon information and belief, UC institutionalized OCR's direct and/or Indirect Gender Bias Motivations into UC's implementation of UC Policies. Evidence supporting this allegation includes, but is not limited to, threats made by Sec. Lhamon in February 2014 when she told college officials attending a conference at the University of Virginia that schools need to make "radical" change.

21. According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington." *See*, *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicles of Higher Education, February 11, 2014, located at http://chronicle.com/article/Colleges-Are-Reminded-of/144703/ (accessed 6/22/17).

22. Upon information and belief, UC feared that if UC did not show preferential treatment to females such as Schoewe who allege sexual misconduct by males, UC would lose its federal funding. Evidence supporting this belief includes, but is not limited to, an OCR complaint Schoewe filed against UC alleging UC "fail[ed] to promptly and equitably respond to complaints, reports and/or incidents of sexual violence of which it had notice." *See*, *Exhibit 4* (containing OCR Notification to University of Cincinnati of Investigation) and *Exhibit 5* (containing the Cincinnati Enquirer article entitled *"In the Dark: Meet the Sexual Assault Survivor Who Ignited a Federal Investigation of UC"*)

23. OCR's investigation of Schoewe's complaint against UC[7] occurred simultaneously with UC's disciplinary proceedings against Gischel. Evidence supporting this belief includes, but is not limited to, the newspaper article Cincinnati Enquirer article entitled *"In The Dark: Meet The Sexual Assault Survivor Who Ignited A Federal Investigation Of UC*" *Id,* OCR documentation contained in *Exhibit 4* which describes OCR's investigation of UC and *Exhibit 6, p.85* (containing the OUJA file) which reflects Cummins' notation OUJA file that Schoewe's accusation against Gischel was part of OCR's investigation of UC.

24. Cummins' notation in the OUJA file to UC Assistant General Counsel Stone suggests the high sensitivity of UC to the OCR investigation for fear of losing federal funds if OCR

---

[7] *Exhibit 46* (containing Schoewe's Complaint against UC filed with OCR, received pursuant to FOIA Request)

determined UC was not aggressively disciplining male students alleged to have engaged in sexual misconduct. *Id.*

25. Indeed, Cummins immediately reacted when UC received notice of Schoewe's OCR complaint. For example, within two weeks of notice of OCR's investigation, Cummins set the matter for administrative hearing after the Title IX office allowed the investigation phase to languish for six months and OUJA allowing it to sit for an additional month.

26. Upon information and belief, OCR pressured UC to equate female "complainants" like Schoewe as entitled to preferential treatment over the male students whom these females allege engage in sexual misconduct. Evidence supporting this belief, includes, but is not limited to, OCR's direct and/or Indirect Gender Bias Motivations detailed in this Complaint. Additionally, UC expelled Gischel from UC– after a hearing that lasted less than two hours - one month after UC was notified of the OCR investigation.[8] *See, Exhibit 7*, p.20.

27. Unfortunately, UC is only one of dozens of colleges subject to these types of OCR investigations. *See e.g.*, https://projects.chronicle.com/titleix/investigations / (accessed 6/22/17) (containing database of information related to DOE's Title IX investigations of colleges and universities since 2011)

---

[8] State Defendants will likely allege that factors other than gender bias motivated the sanctions imposed on Gischel. But, the Second Circuit Court of Appeals' recent decision in *Doe v. Columbia University,* No. 15-1536 (2d Cir. 2016) suggests otherwise. In reversing a district court decision dismissing a Title IX complaint by a male college student, *Columbia* wrote: "It is worth noting that the possible motivations mentioned by the district court as more plausible than sex discrimination, including a fear of negative publicity or of Title IX liability, are not necessarily, as the district court characterized them, lawful motivations distinct from sex bias." *Id.* at. ¶11. The *Columbia* court also stated a university: "is not excused from liability for discrimination because the [university's] discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action. A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex." *Id.*

28. Many academics, authors, and organizations have raised alarms that DOE/OCR's worthwhile goal of protecting college students from sexual misconduct has evolved into an unlawful example of federal governmental overreach that violates the rights of male students who never engaged in misconduct. *See e.g.,* Emily D. Safko, *Are Campus Sexual Assault Tribunals Fair?: The Need For Judicial Review and Additional Due Process Protections In Light of New Case Law*, 84 Fordham L. Rev. 2289 (2016), pgs. 2304-5 (discussing universities' concerns regarding OCR enforcement actions that commentators believe "incentivizes schools to hold accused students accountable by implementing and conducting proceedings that are unfairly stacked against the accused."). *Id.*, pgs. 2320-24 (addressing same); *Exhibit 8* (containing *Open Letter From Sixteen Members of Penn Law School Faculty* (Feb. 17. 2014) which states in part: "Although we appreciate the efforts of Penn and other universities to implement fair procedures, particularly in light of the financial sanctions threatened by OCR, we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."); Barclay Sutton Hendrix, *A Feather On One Side, A Brick On The Other: Tilting The Scale Against Males Accused of Sexual Assault In Campus Disciplinary Proceedings*, 47 Ga. L. Rev. 591, (2013); Stephen Henrick, *A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses*, 40 N. Ky. L. Rev. 49 (2013); *Exhibit 9* (containing *Rethink Harvard's Sexual Harassment Policy*, LETTER TO EDITOR, BOSTON GLOBE, Oct. 15, 2015); Janet Halley, *Trading the Megaphone for the Gravel Gavel in Title IX Enforcement*, HARV. L. REV. F. 103, 103-17, (2014); Samantha Harris, *Campus Judiciaries on Trial: An Update from the Court*, HERITAGE FOUNDATION, Oct. 6. 2015; http://www.heritage.org/research/reports/2015/10/campus-judiciaries-on-

trial-an-update-from-the-courts (accessed 6/22/17); Janet Napolitano, *"Only Yes Means Yes": An Essay on University Policies Regarding Sexual Violence and Sexual Assault*, Yale Law and Policy Review Volume 33; Issue 2 (2015); Robin Wilson, *Presumed Guilty*, CHRONICLE OF HIGHER EDUCATION (Sept. 3. 2014) http://chronicle.com/article/Presumed-Guilty/148529/?cid=a&utm_medium=en (accessed 6/22/17) (noting: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."); *Dershowitz and Other Professors Decry 'Pervasive and Severe Infringement' of Student Rights*, Jacob Gershman (May 18, 2016), http://blogs.wsj.com/law/2016/05/18/dershowitz-and-other-professors-decry-pervasive-and-severe-infringement-of-student-rights/ (accessed 6/22/17).

29. As detailed in many of the publications cited above, OCR's investigations put millions of dollars in federal student aid at risk.  This is because DOE/OCR can impose civil penalties and/or suspend institutions from participating in federal student financial aid programs if DOE/OCR finds a university, such as UC, did not do enough to discipline males alleged to have engaged in sexual misconduct with female students.  Sec. Lhamon confirmed this risk of losing federal funds at a national conference at Dartmouth in the summer of 2014 when she said, "I will go to enforcement, and I am prepared to withhold federal funds."  *See, How Campus Sexual Assaults Came to Command New Attention*, NPR, August 12, 2014

located at http://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention (accessed 6/22/17).

30. Similarly, in June 2014, Sec. Lhamon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . . ." In addition, Sec. Lhamon noted:

> "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments." https://www.help.senate.gov/hearings/sexual-assault-on-campus-working-to-ensure-student-safety (accessed 6/22/17)

31. Upon information and belief, for UC, the withdrawal of federal funding would be catastrophic, in part, because UC's undergraduate students received over $26,384,868 in Pell Grants and over $89,431,334 in Federal Student Loans in 2015. *See generally*, http://nces.ed.gov/collegenavigator/?q=University+of+Cincinnati&s=OH&id=201885 (accessed 6/22/17).

32. In 2016, the American Association of University Professors severely criticized OCR's mandates as undermining students' rights to fair and impartial adjudications in cases of alleged sexual misconduct. *Exhibit 10* (containing AAUP's March 24, 2016 publication entitled: *Executive Summary: The History, Uses, and Abuses of Title IX*).

33. Similarly, in 2017, The American College of Trial Attorneys' ("ACTA") *White Paper on Campus Sexual Assault Investigations* noted: "OCR has established investigative and

disciplinary procedures that, in application, are in many cases fundamentally unfair to students accused of sexual misconduct." *Exhibit 11*, p.3 (containing American College of Trial Attorneys' March 2017 White Paper on Campus Sexual Assault Investigations). To remedy this unfairness, ACTA made the following recommendations:

(a) Sexual misconduct investigations and hearings should be conducted with due consideration for any appearance of partiality, including that which might arise from the factfinder's other responsibilities or affiliations;

(b) The subject of a sexual misconduct investigation should promptly be provided with the details of the allegations and advised of his/her right to consult legal counsel;

(c) The subject of a sexual misconduct investigation has the right to be advised and accompanied by legal counsel at all stages of the investigation;

(d) The parties to a sexual misconduct investigation should be permitted to conduct some form of cross-examination of witnesses, in a manner deemed appropriate by the institution, in order to test the veracity of witnesses and documents;

(e) The subject of a sexual misconduct investigation should be provided with access to all evidence at a meaningful time and in a meaningful manner so that he/she can adequately respond to it;

(f) The standard of proof for "responsibility" should be clear and convincing evidence; and

(g) Factfinders in sexual misconduct investigations and hearings should produce written findings of fact and conclusions sufficiently detailed to permit meaningful appellate review. *Id*., p.2.

34. As evidence of UC's direct and/or Indirect gender bias motivation, the OUJA published its "Resource Guide for Student Survivors of Sexual Assault" in December 2011 which:

(a) refers to accusers as "survivors" throughout the document, in contrast to the DOE OCR which refers to accusers as "complainants;"

(b) proclaims a Survivor's Rights Guarantee, including the following rights:
- Survivors will not be judged, subjected to biased attitudes or *blamed for the incident;*
- Survivors will be *granted conditional amnesty* for all drug and alcohol related violations of the Student Code of Conduct at the time of the incident;
- the *prior irrelevant conduct*, including the sexual history, of the survivor *will not be discussed*. (Emphasis added)

(c) defines consent as follows:
  "Whether or not consent existed at the time of the incident is important for determining if a violation has occurred. Consent amounts to the freely given, willing, and knowing approval of each participant in sexual activities. Both parties must also clearly and positively communicate their

intent to engage in sexual activities. The party initiating sexual activity has the responsibility to ensure that he or she receives consent from the other party. *Consent for sexual conduct or activities **can never occur** when one of the parties is under the influence of drugs and/or alcohol voluntarily or involuntarily.* A person who engages in sexual conduct due to force, threat of force, or coercion has not consented. Survivors should also remember that physical resistance is not necessary to prove lack of consent;" and

(d)     states "The most important role for faculty and staff is to *support the survivor*." *Exhibit 1,* pp. 56, 60, 62 and 80.

35. As detailed below, because of its direct and/or Indirect Gender Bias Motivations, UC afforded Gischel none of the traditional cornerstones of America justice articulated by ACTA.  Instead, upon information and belief, UC allowed gender bias to motivate its decision to ignore the exculpatory evidence establishing Gischel's innocence.  This occurred, in part, because of UC's incorporation of the Obama Administration's "It's on us" campaign.

36. Upon information and belief, UC's erroneous discipline of Gischel was motivated by anti-male bias stemming in part from its participation in the It's On Us campaign which portrays male students as sexual predators by distributing promotional materials that state:

(a)     "It's on us to make sure guys know that if she doesn't or can't consent to sex, it's sexual assault."  See generally, http://www.aplu.org/members/councils/governmental-affairs/CGA-library/its-on-us-toolkit/file (accessed 6/22/17)

(b)     Suggesting individuals videotape themselves "[s]ay[ing] to a camera…it's on us to recognize that if a woman doesn't or can't consent to sex, it's rape." *Id*., (Emphasis added); and

(c)     Stating: "Never blame the victim," "always be on the side of the survivor," and "trust the survivor."  *Id.*

37. Upon information and belief, in response to pressure from the DOE/OCR that universities increase the percentage of male students found responsible for engaging in sexual misconduct with female students, UC joined the "It's On Us" Campaign in 2014.  Support for this belief includes, but is not limited, a UC press releases such as: (a) "UC It's On Us

launches this week with a video, posters and a Main Street drive for student participation. It follows the principles established by President Barack Obama and Vice President Joe Biden in September and highlights UC's leadership role in efforts to better prevent and respond to sexual assault." http://www.uc.edu/news/nr.aspx?id=20807 (accessed 6/22/2017).

38. Similarly, UC invited Lynn Rosenthal, the adviser to the White House on Violence against Women, to help kick off UC's Its On Us campaign in November 2014. During her presentation, Rosenthal approved UC's endorsement of the Obama Administration's goals by stating: "I almost feel like my work in the White House is done when a college president stands before you and takes the pledge and says, 'It's on us.'" http://www.newsrecord.org/news/university-recognized-for-work-against-sexual-assault/article_2509036e-737f-11e4-8ea9-5791be1cc3d4.html (accessed 6/22/17)

39. UC encourages its faculty, staff and students to take the "It's On Us" pledge, as demonstrated in the video found at http://www.uc.edu/news/nr.aspx?id=21185 (accessed 6/22/17) and Exhibit 12 (containing screen shot of faces of UC personnel taking It's On Us pledge.) This video includes key UC leadership including then President Ono, defendant Shaffer, and Vice President for Student Affairs & Services, Debra Merchant.

40. In fact, both defendants Shaffer and Richey have endorsed the Obama Administration's It's On Us campaign. *Id.* and *Exhibit 13* (containing Richey holding It's On Us sign).

41. One example of the direct and/or Indirect Gender Bias Manifestations related to The Obama Administration's "It's On Us," campaign is its inaccurate allegation that: "[a]n estimated one in five women has been sexually assaulted during her college years. . . ."

*See, e.g.,* https://www.whitehouse.gov/blog/2014/09/19/president-obama-launches-its-us-campaign-end-sexual-assault-campus  (accessed  6/22/17); https://www.whitehouse.gov/the-press-office/2014/04/29/fact-sheet-not-alone-protecting-students-sexual-assault  (accessed 6/22/17); https://www.whitehouse.gov/the-press-office/2014/04/29/fact-sheet-not-alone-protecting-students-sexual-assault (accessed 6/22/17); https://www.whitehouse.gov/blog/2014/09/19/president-obama-launches-its-us-campaign-end-sexual-assault-campus  (accessed 6/22/17).[9]

42. UC's direct and Indirect Gender Bias Manifestations includes its repeated accusation that a large portion of their male students are sexual predators. For example, in 2015, UC repeatedly published the allegation that 1 in 4 or 1 in 5 female students, or by some UC accounts, 5081 females were sexually assaulted. *Exhibit 14 (*containing website images of the statistic and President Ono endorsement of 5081 campaign).

43. Similarly, the official UC news page contains the following: "#UCIt'sOnUs is the latest in a series of efforts by the university to repeat and propagate the sobering statistics: one in four women and one in 16 men will be sexually assaulted in college." http://www.uc.edu/news/NR.aspx?id=20807  (accessed 6/22/17).

44. In 2014, UC welcomed a new Title IX Program Coordinator citing "[t]he recent release of a White House report and the White House's "It's On Us" campaign" and simultaneously promoted the #UCItsOnUs campaign and the Consent Culture Campaign which actively promotes the false 1 in 4 statistic. *See generally*, http://www.uc.edu/news/NR.aspx?id=20807  (accessed  6/22/17) (discussing UC's connection with the Consent Culture Campaign), *Exhibit 15* (containing webpage from Consent Culture) and *Exhibit 16* (containing About Us page from UC Women's Center)

---

[9] *Supra,* fn.6 (detailing the inaccuracy of the "It's On Us," allegation that: "[a]n estimated one in five women has been sexually assaulted during her college years.").

45. As detailed, in part, in footnote 6 above, allegations that 20% of America's female college students are being sexually assaulted by their male counterparts has been thoroughly refuted by organizations such as the Bureau of Justice Statistics which determined only 0.61% of female college students are sexually assaulted.

46. Evidence disproving UC's allegation that upwards of 20-25% of its female students are sexually assaulted is disproven by the fact that 54% of UC's students during the 2015-2016 academic year were female.    https://www.uc.edu/about/ucfactsheet.html    (accessed 6/22/17) Therefore, if the one in four or one in five statistic were accurate, approximately 4,776 female UC students would be sexually assaulted during their four year stay at UC's main campus, or 1,194 females students per year. Yet, the reality is nowhere close to that extrapolated statistic.  This is because from 2013-2015, there were 35 forcible rapes and sex offenses reported by UC pursuant to the Clery Act requirements. http://www.uc.edu/content/dam/uc/publicsafety/docs/2016%20ASR%20Final%20Copy.pdf  (accessed 6/22/2017).

47. Similarly, Emily Yoffe's 2014 article in Slate refutes the "1 in 5" allegation and attempts to expose the falseness of the statistic.  Emily Yoffe, *The College Rape Overcorrection*, SLATE,                       Dec.                       7,                       2014, http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_is_a_serious_problem_but_the_efforts.html  (accessed 6/22/17).  Specifically, Ms. Yoffe asked Christopher Krebs - the lead author of the study cited by President Obama - whether his study represented the experience of the approximately 12 million female students in America.  *Id*.  Mr. Krebs stated those involved in the study, "don't think one in five is a nationally representative statistic." *Id*.  This was because Mr. Krebs stated his

sampling of only two schools "[i]n no way . . . make[s] our results nationally representative." *Id.  See also*, Heather MacDonald, *An Assault on Common Sense,* The Weekly Standard, Nov. 2, 2105, http://www.weeklystandard.com/an-assault-on-common-sense/article/1051200 (accessed 6/22/17) (detailing why a recent survey conducted by Association of American Universities has been improperly distorted to falsely suggest large percentages of female college students are being sexually assaulted on America's college campuses).

48. Ms. Yoffe also noted that if the "one-fifth to one-quarter assertion [regarding sexual assaults on college campuses were accurate that] would mean that young American college women are raped at a rate similar to women in Congo, where rape has been used as a weapon of war."  Emily Yoffe, *The College Rape Overcorrection*, SLATE, December 7, 2014,

http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_is_a_serious_problem_but_the_efforts.html (accessed 6/22/17).

49. Nevertheless, then V.P. Joe Biden repeatedly presented direct and/or Indirect Gender Bias Motivations in promoting the Obama Administration's "It's On Us" campaign as a tool to protect female students from male students. *See e.g.*, https://www.osu.edu/buckeyesact/vpbidenvideo.html (accessed 6/22/17).  V.P. Biden also made it clear the Obama Administration and DOE used Title IX investigations and potential loss of federal funding to encourage university presidents to join the campaign. *Id.*  In addition, V.P. Biden manifested direct and/or Indirect Gender Bias Motivations by encouraging "guys" to take the "It's On Us" pledge to combat the fact that 1 in 5 college women are the victim of sexual assault while attending college.  *Id.*

50. In addition to falsely portraying large numbers of its male students as sexual predators, UC engages in other examples of direct and Indirect Gender Bias Motivations which include, but are not limited to, UC's affiliation with the Consent Culture Campaign. This campaign manifests direct and/or Indirect Gender Bias Motivations by compelling UC faculty and students to reject the possibility that female students make false allegations of sexual assault. Evidence supporting this belief includes the Consent Culture Campaign's allegation that: "if you are a survivor of sexual assault know that *we believe you* and stand in solidarity with you" and "Please remember that it was not your fault." *See*, http://onlywithconsent.org/blog/consent-culture (accessed 6/22/17) (emphasis added).

51. UC students are also encouraged to embrace Consent Culture's definition of "consent" as a "verbal, ongoing, sober yes to sex" even though this definition is in conflict with UC Policies' definition of the term "consent." *Compare*, http://www.uc.edu/news/nr.aspx?id=20807 (accessed 6/22/17) (containing Consent Culture's definition of "consent" and UC's recommendation that students take the #ConsentCulture pledge and sign the mobile #ConsentCulture pledge board. . . ."), with *Exhibit 1*, p.38 (containing UC's definition of "consent" which does not state students must be "sober.").

52. UC's direct and Indirect Gender Bias Manifestations are further manifested, in part, by UC's hosting and sponsoring a showing of the film "The Hunting Ground." In promoting the film, UC detailed how: "Sexual assault is a serious problem on college campuses across the nation. One in four young women will be raped during their college years. We hope that students who attend this event will learn about the protection they have under Title IX as well the resources UC provides to victims of sexual assault."

http://www.uc.edu/news/NR.aspx?id=23179 (accessed 6/22/17). However, as detailed in

items a-d below, "The Hunting Ground" has been widely criticized for anti-male bias:

(a)   Nineteen Harvard University professors denounced the film as "propaganda" that paints "a seriously false picture of general sexual assault phenomenon at universities and or our student Brandon Winston in part because "Harvard University School Faculty concluded after extensive review of the facts that there was insufficient evidence to support the [sexual assult] charges made against him" by the female profiled in the Hunting Ground. *Exhibit 17* (containing Harvard University Law School's Nov. 11, 2015 Press Release);

(b)   The National Review noted the film was "highly misleading if not dishonest" in its portrayal of sexual assaults of female students by their male counterparts. In discussing this anti-male bias, the article states: "[w]e don't operate the same way as journalists — this is a film project very much in the corner of advocacy for victims, so there would be no insensitive questions or the need to get the perpetrator's side." *See*, http://www.nationalreview.com/article/427166/hunting-ground-smoking-gun-e-mail-exposes-filmmaker-bias-against-accused (accessed 6/22/17);

(c)   Numerous news outlets detailed in part how the film features three women, whose claims of sexual assault were later largely discredited, including in one case fabricating evidence (a bloody condom that when eventually tested contained DNA of another male who was not the alleged assailant); *See*, http://www.slate.com/articles/news_and_politics/doublex/2015/06/the_hunting_ground_a_closer_look_at_the_influential_documentary_reveals.html (accessed 6/22/17); http://www.nationalreview.com/article/415269/cinematic-railroading-jameis-winston-stuart-taylor-jr (accessed 6/22/17), and http://www.thedailybeast.com/articles/2015/02/03/columbia-student-i-didn-t-rape-her.html (accessed 6/22/17); and

(d)   The film repeats the false claim that one in five college women are sexually assaulted in college even though the U.S. Department of Justice reports a woman's risk is less than one percent (0.61%) each year. *Supra*, f.n.6 (discussing the U.S. Department of Justice's finding that only .61% of female college students are sexually assaulted during their college years).[10]

53. Similarly, the UC Women's Center engages in direct and Indirect Gender Bias

Manifestations by defining "consent" as "something that can't be given if a person is

intoxicated" even though UC's Polices impose the higher standard of "incapacitated."

---

[10] In fact, a report issued by The American Association of University Women noted that over 90% of the colleges and universities in the United States reported none of their students were raped in 2014. *See*, http://www.aauw.org/article/clery-act-data-analysis/ (accessed 6/22/17)

Compare, *Exhibit 1*, p.38 (containing definition of "consent" in UC Policies), *Exhibit 18* (containing UC Women's Center's statement: "Bearcats get consent — that's the message UC is spreading on campus. Consent is informed, freely given, mutual and can be withdrawn at any time — and it's something that can't be given if a person is intoxicated.").

54. UC's direct and/or indirect gender bias motivations are also evidenced in its close alignment and alliance with the American Association of University Women ("AAUW") an organization dedicated to "empowering women as individuals and as a community." http://www.aauw.org/what-we-do/ (accessed 6/22/17) and *Exhibit 19* detailing UC's membership in AAUW), *Exhibits 20 and 21* (containing UC Women's Center webpages demonstrating alliance with AAUW) and *Exhibits 22-24* (detailing AAUW direct and/or indirect gender bias motivations).

55. In and of itself, AAUW's mission seems harmless and gender neutral. However, a closer look at AAUW's website evidences direct and/or indirect gender bias motivations, including use of the fallacious 1 in 5 statistic. *Id.* AAUW's *10 Ways to Fight against Sexual Assault* very poignantly addresses primarily the rights of women and girls. *Exhibit 22* (containing AAUW *10 Ways to Fight against Sexual Assault*) Finally, UC's Women's Center sponsors AAUW supports events which advertise "priority given to women-identified" students. *Exhibit 20.*

56. As early as 2002, UC has also been engaged in the Clothesline Project which manifests direct and/or indirect gender bias motivations. *Exhibit 26*[11] (containing webpage of UC list of activities for Sexual Assault Awareness Week. *See,* http://clotheslineproject.info/.

---

[11] *Exhibit 25,* has been omitted.

(accessed 6/22/17) The Clothesline Project manifests its direct and/or indirect gender bias motivations in the following statements taken from the website:

(a) Clothesline Project's events are designed to develop "provocative 'in-your face' educational and healing tool[s]" that "break the silence and bear witness to *one issue* – *violence against women*;"

(b) Defines a "[s]urvivor" as "a *woman* who has survived intimate personal violence such as a rape; battering, incest, child sexual abuse." and;

(c) Defines "[v]ictim" as "a *woman* who has died at the hands of her abuser. *Id.,* (containing information from *The Clothesline Project's* website) (emphasis added).

57. UC's direct and Indirect Gender Bias Manifestations are also evidenced in its sponsorship of the annual Slut Walk. *Exhibit 27* (containing webpage of UC news article on Slut Walk). The Slut Walk is an effort to support the "core mission of uplifting, empowering and enhancing the platform of women across the globe. … and to support groups and organizations of women who have been subject to slut shaming, a lack of implication of double standards, sexual assault and even rape." http://amberroseslutwalk.com/general-information/ (accessed 6/22/17).

58. On November 1, 2015 a number of students staged a walk on the UC campus to combat the so-called rape culture at UC and demand changes. *UC Feminist's Walk of No Shame Combats Slut-Shaming, Campus Rape Culture*, News Record, Nov. 1, 2015, available at: http://www.newsrecord.org/college_life/uc-feminist-s-walk-of-no-shamecombats-slut-shaming/article_26b4cc76-a422-80de-11e5 -f305c9f263b0.html. (accessed 6/22/17)

59. In addition, upon information and belief, UC adopted and implemented gender-biased policies and procedures for addressing complaints of sexual assault to avoid continued internal pressure and negative publicity that UC was not doing enough to support women who alleged they were sexually assaulted by male students. Evidence supporting this

belief, includes, but is not limited to, a backlash that occurred in 2014 when UC suspended a 24-hour sexual assault hotline run by UC's Women's Center which shutdown "caused anger from the program's supporters on campus." *http://www.citybeat.com/news/article/13001809/mixed-messages (accessed 6/22/17).*

60. The protests of these mainly female students prompted Amy Howton - then interim Director of the UC Women's Center – to announce her resignation in protest from the Women's Center even though UC reinstated RECLAIM.  Specifically, Ms. Howton noted:

> "I think the administration, when they began to see the students' reaction to the decision that had been made — and that was clearly articulated to the students that Monday on the 17th that RECLAIM was dissolved — they then reversed their decision and said that RECLAIM would continue," *Id.*

61. In August 2015, protests burst out again against the UC administration's decision to shut down a survivor oriented training program called RECLAIM, run by the UC Women's Center.  During one of these protests, "RECLAIM participants held a silent protest against the administrators, and photos of participants with the word 'survivor' written across their chests and red tape over their mouths were posted on Facebook and other social media sites."  *Exhibit 28* (containing 8/27/15 Newsrecord article *Future of Reclaim*)

62. In response to the women's protest, Debra Merchant, UC Vice President for Student Affairs and Nicole Mayo Assistant UC Vice-President for Engagement & Assessment met with complaining female students to express concerns to the administration. *Id.,* p.1 UC officials immediately backtracked and said they would reinstate the RECLAIM program in an effort to justify its actions and demonstrate sympathy and support for mainly female protestors.

63. Bev Davenport, then the Senior Vice President and Provost at UC, reflected the frustration of the UC administration that it was seen as uncaring and insensitive to women's sexual assault issues, stating: "I mean we're all struggling" . . . "There's a reason why there are

cases across the country. We're all working really hard to find those places of agreements and those best practices at every single step in the process." *Id.* p.4

64. Davenport also exhibited direct and/or Indirect Gender Bias Manifestations by noting:

"We have devoted our lives to this work," . . . "We both have *daughters*. We couldn't be more concerned about getting this right. You all lead us, you teach us, but work with us in trying to get this right. We need advocates, we need educators, we need leaders, we need people who will be on the front line with us." *Id.,* p. 5 (Emphasis added).

65. Upon information and belief, UC's erroneous discipline of Gischel was also motivated by internal and external pressure associated with an article in Cincinnati Enquirer that alleged UC was not doing enough to support women who alleged they were sexually assaulted by male students. Specifically, on August 30, 2015 an editorial in The Cincinnati Enquirer authored by Kristin Shrimplin - the executive director of community-based sexual assault support center Women Helping Women – stated in part:

"My colleagues and I at *Women Helping Women are deeply concerned that the University of Cincinnati currently does not have a functional campus-based peer survivor advocacy program* in place. RECLAIM, the program that has served UC sexual assault survivors for more than a decade and has received national acclaim from the White House for its efficacy, is unable to provide services due to the fact that the program's required and extensive 40-hour training was halted…."
http://www.cincinnati.com/story/opinion/contributors/2015/08/30/opinion-loss-uc-rape-survivor-program-troubling/71437468/ (accessed 6/22/17) (emphasis added).

66. Further criticism of UC came from the City of Cincinnati's Health Department which decried the UC administration for threatening to shut down the sexual assault response program. *Exhibit 29* (containing article from the City of Cincinnati's Health Department).

67. Moreover, based on the information detailed in this Complaint, and upon information and belief, UC's unlawful discipline of Gischel occurred, in part, because of UC's archaic assumptions that female students do not sexually assault fellow male students because

females are less sexually promiscuous than males. Evidence supporting this belief, includes, but is not limited to, State Defendants':

(a) Unlawful rejection of the preponderance of evidence which proved Schoewe voluntarily consented to sexual intercourse and other sexual activity with Gischel. See generally, *Infra,* §§3-4 (discussing same;

(b) Decision to ignore testimony that established Gischel's innocence in part because that testimony proved Schoewe's allegations were internally inconsistent and lacking in credibility. *Id.*,

(c) Prohibiting Gischel from challenging the credibility of Schoewe or her witnesses; *Id.*, and

(d) Unlawful discipline of Gischel for accepting Schoewe's offer to engage in sexual activity that Schoewe initiated and consented to but apparently later regretted. *Id.*

68. Upon information and belief, the violations of UC Policies and Gischel's due process and Title IX rights occurred because State Defendants embraced direct and/or Indirect Gender Bias Motivations in UC's training materials given to individuals investigating and adjudicating sexual assault allegations. Evidence supporting this belief includes, but is not limited to the 2015 ARC Training Outline-JDA, attached as *Exhibit 30*. Direct and/or Indirect Gender Bias Manifestations in this training material include, but are not limited to statements such as:

(a) "Some *men* believe that spending money on a women means that she owes them sex at the end of the evening;"

(b) "Some *men* believe that women play hard to get, by saying "no" when they really mean "yes" and enjoy being aggressively pursues;"

(c) "Some *men* perceive that sex is their right;"

(d) Falsely alleging large percentages of male students are sexually assaulting their female peers by claiming: (i) "It is estimated that for a school the size of the University of Cincinnati, about 1,225 rapes or attempted rapes occur each year" even though (ii) the training materials admit that in 2014 only "48 rapes reported to the SARC; of those, 2 reported to UCPD;"

(e) "A *woman has a 4x greater chance of being raped* by someone she knows than by a stranger;" and

(f) "*83% of perpetrators are* acquaintances (friends of the family, dates, *boyfriends*, relatives, authority figures);" *Id.*, p. 29 (emphasis added).

69. State Defendants' direct and Indirect Gender Bias Motivations have created a hostile environment which in turn creates an adverse educational setting in violation of Title IX in part because UC engages in sex stereotyping discrimination based on unlawful notions of masculinity and femininity. This hostile environment causes innocent males on UC's campus to be unlawfully disciplined and interferes with males' ability to participate in or benefit from various activities including learning on campus.

70. OCR, the Obama Administration, and/or UC's legitimate goal of preventing sexual assault is not the issue in, nor is it the basis for, this Complaint. Rather, this Complaint addresses how UC's unlawful discipline of Gischel was motivated by direct and Indirect Gender Bias Evidence designed to:

> (a)    Afford females like Schoewe preferential treatment in violation of Title IX and/or UC Policies;
> (b)    Severely discipline male students like Gischel who are alleged to have engaged in sexual misconduct regardless of their innocence; and
> (c)    Equate "victim/complainants" in sexual misconduct proceedings as being females who receive preferential treatment over the males they accuse of sexual misconduct.

71. Upon information and belief, items a-c in ¶70 motivated UC's erroneous determination that Gischel violated UC Policies. Evidence supporting this belief includes, but is not limited to, the fact that defendant Shaffer - UC's Title IX Coordinator and the investigator of Schoewe's Title IX complaint against Gischel - was affiliated with the Association of Title IX Administrators' ("ATIXA") and as of this year was still a paid consultant with the National Center for Higher Education Risk Management ("NCHERM"). *Exhibit 31* (containing Shaffer's media page) Further, Shaffer's resume demonstrates close association with ATIXA. *Exhibit 32* (containing Shaffer's resume) and *Exhibit 33*

(containing Shaffer's LinkedIn Profile) which also demonstrates Shaffer's association with ATIXA and NCHERM.

72. ATIXA and NCHERM are interconnected organizations which manifest direct and/or Indirect Gender Bias Evidence which includes, but is not limited to, equating victim/complainants in sexual misconduct proceedings as being females who must receive preferential treatment by:

    (a)    Use of female pronouns when referring to the victim of alleged sexual misconduct;

    (b)    Use of masculine pronouns when referring to the students alleged to have engaged in sexual misconduct;

    (c)    Referring to students alleged to have engaged in sexual misconduct as "the usual suspects";

    (d)    Advocating that the burden of proof regarding whether a female student consented to sexual contact should be placed on the male student because "[t]he core of consent is the right of the victim to be unmolested until she gives clear permission for sexual activity to take place-what I call sexual sovereignty." *Exhibit 45* (containing pages from NCHERM's website)

    (e)    NCHERM's bias in favor of female victims is reflected in an Open Letter from the NCHERM Group which states: ". . . our experience suggests victims tell the truth." *See, Exhibit 40,* p.1 (containing NCHERM's Open Letter) and

    (f)    Identifying NCHERM's focus and goal of limiting the procedural protections afforded male students like Gischel in sexual misconduct cases and combating "gender-based" sexual misconduct. *See,* https://www.ncherm.org/wordpress/wp-content/uploads/2012/01/2014-Whitepaper-FINAL.pdf (accessed 6/22/17).

73. ATIXA and NCHERM's direct and/or indirect gender bias motivations are further evidenced in their "2014 Whitepaper" entitled *Equity Is Such a Lonely Word. Id.* This Whitepaper states:

"victims have historically been accorded 3/5 of the rights of an accused individual (or less), and victims are typically *women*, equity may require institutions to recalibrate the pendulum to right the historical imbalance. An equitable process on many campuses will force a victim focus, but only as a casualty of history." *Id.,* p.23-24 (emphasis added).

74. ATIXA's Whitepaper also details OCR's demands that colleges limit the due process rights of males accused of sexual misconduct by stating: (a) "[a] hearing became a panel . . . [t]he

panel afforded presumptions of innocence, rights to attorneys, rights to remain silent. Rights, rights, rights. But, we forgot about victims along the way." and (b) OCR's 2011 DCL "indicated that we must deconstruct part of the due process castle . . . [and ensure the] complainants should be inconvenienced only as far as absolutely required to remedy the discrimination." *Id*., p. 5, 13-14.

75. Brett Sokolow, NCHERM's President himself has stated NCHERM has "always been victim-centered in our work" and that he hopes "one of our legacies is that we've advocated very effectively to advance the rights of campus sexual assault survivors." *Exhibit 34,* p.8 (containing Article from Buzz Feed) In the same Buzz Feed article, defendant Jyl Shaffer, defends the direct and/or indirect gender bias manifestations of Sokolow and NCHERM, by noting: "'Consultants tend to be big-picture people with big personalities … they are worth the price.  I appreciate NCHERM and ATIXA…'" *Id.*, p. 7

76. Further, University of Cincinnati pays NCHERM to serve as outside counsel/advisor. *Exhibit 35* (containing NCHERM's website list of member universities)

77. Upon information and belief, State Defendants' violations of UC's Policies and Gischel's due process and Title IX rights occurred in part because State Defendants embraced NCHERM and ATIXA's direct and/or Indirect Gender Bias Motivations.   Upon information and belief, UC and Shaffer incorporated ATIXA and/or NCHERM direct and/or indirect gender bias motivations into UC's training UC employees, including, but not limited to, the ARC panel members and members of the OUJA, who adjudicated Schoewe's complaint against Gischel. Evidence supporting this belief includes, but is not limited to, State Defendants' application of NCHERM and ATIXA's abovementioned practices as detailed below.

78. For example, on one hand, defendant Shaffer told UC's newspaper that her role as UC Coordinator of the Title IX office included the obligation to act as a "neutral" investigator. *Exhibit 36,* p.2 (containing UC article on Shaffer). On the other, Shaffer's connection with NCHERM motivates her desire to assist "institutions with a focus on victim services." *Exhibit 33* (containing Shaffer's Linked IN profile)

79. Similarly, in October 2015, Shaffer contributed to a report entitled, *Changing Campus Culture: Preventing and Responding to Sexual Violence.* https://www.ohiohighered.org/sites/ohiohighered.org/files/uploads/ccc/Changing-Campus-Culture-Report_102015.pdf (accessed 6/22/17)  In this report, Shaffer and others recommended that a school system should not be aimed at determining whether a sexual assault has occurred, but should, instead, assume that a sexual assault did occur. The report recommended, "Survivors of sexual assault should feel they are believed and trust that the system works for them." *Id. p.*

80. Upon information and belief, Shaffer's direct and/or Indirect Gender Bias Motivations, included, but were not limited to, her decision not to personally interview Gischel in order to deny him the ability to: (a) request a disciplinary proceeding be launched against Schoewe for violating UC Policies when she grabbed Gischel's penis without consent; (b) present exculpatory evidence establishing his innocence, which included, but not limited to evidence of his intoxication and impairment; and/or (c) present facts concerning Schoewe's lack of incapacitation.  *See generally, Supra,* §3.

81. During Gischel's hearing, Shaffer manifested direct and/or Indirect Gender Bias Motivations which included, but were not limited to: (a) omitting any discussion of the exculpatory evidence manifest in the contradictory and/or inconsistent testimony of

Schoewe's witnesses; (b) failing to provide UC's ARC with Schoewe's toxicology report which demonstrated an absence of date rape drugs Schoewe alleged were in her system; and/or (c) failing to provide the ARC evidence of Gischel's level of intoxication as detailed in this Complaint. *Infra, ¶* 99, 141

82. Similarly, Defendant Richey manifested direct and/or Indirect Evidence of Gender Bias Motivations in his interrogation of Gischel. For example, during Richey's interrogation, Richey stated Gischel must have been excited when Schoewe grabbed Gischel's penis. *Exhibit 7*, p.66. But, Richey did not ask Gischel:

    (a)    whether Schoewe asked permission to touch Gischel's penis;
    (b)    whether Schoewe's actions offended Gischel; or
    (c)    whether Gischel felt Schoewe's conduct violated UC Policies.

83. Richey's direct and/or Indirect Evidence of Gender Bias Motivations caused disinterest and apathy in whether Gischel consented to Schoewe's sexual assault on Gischel who was also intoxicated and impaired.

84. On the other hand, when Schoewe told Richey that she kissed Gischel, Richey stated:

> "Let's say you did consent and you decided now I don't want to do this, you have that right. Were you of sound mind to give consent, which clearly you weren't? You can only testify to what you remember, which is not a lot. That's our job, Jyl's job is to fill in those gaps. My argument is, where was the consent for that act. The way Logan Holderness described you even when you started to walk home, there is no way you were able to give consent. The more people that are able to say she was plastered, she was shit faced, it's gonna show you were near incapacitation. That's how I am going to go at this." *Schoewe Interview with UCPD (9/4/15).*

85. Upon information and belief, Richey and/or Shaffer conspired with Schoewe to fabricate and/or destroy evidence against Gischel. Evidence supporting this belief includes, but is not limited to, Richey and/or Schoewe's obstruction of justice which caused criminal

charges against Gischel to be dismissed with prejudice. This conduct is addressed in an affidavit from Attorney Richard J. Goldberg which states:

> I was the attorney for Tyler Gischel with respect to his indictment for Sexual Battery in the Hamilton County Court of Common Pleas. In the course of my representation, I learned through my investigation and discovery that there were relevant and exculpatory social media communications, namely, texting between prosecuting witness Jennifer Schoewe and Detective William Richey. At all times relevant hereto, Det. William Richey was employed by the University of Cincinnati Police Department. The University of Cincinnati Police Department conducted an internal affairs investigation into texting between Jennifer Schoewe and Det. William Richey. During the course of the internal affairs investigation and interview, Det. William Richey refused, upon request, to turn his cell phone over to his lieutenant or superior. While the criminal case against Tyler Gischel was pending, I sought and obtained a court order to have Det. William Richey's Phone forensically analyzed so that the texts between he and Jennifer Schoewe could be extracted. Following the forensic examination of Det. Richey's IPhone, I was informed that Det. Richey had deleted all of the texts in his phone. I was further informed that because it was an I-Phone, the texts would not be retrievable. I then sought and obtained a court order for a forensic examination of Jennifer Schoewe's android cell phone. Once Jennifer Schoewe's cell phone was delivered to my expert, I was informed by my expert that Jennifer Schoewe's android cell phone had water damage. I was further informed that, despite the water damage, there was still a high probability that the texts between Jennifer Schoewe and Det. William Richey could be extracted. I was then informed by our expert that the phone and, specifically, the texts, were encrypted by its user and the passcode would have to be provided in order to extract the texts. Jennifer Schoewe refused to provide the passcode to her android cell phone. The presiding judge in Mr. Gischel's case ordered Jennifer Schoewe to provide our expert with her passcode. Jennifer Schoewe thereupon refused to provide the passcode to her android cell phone. As a consequence of her refusal to provide the passcode, the court dismissed the indictment against Mr. Gischel, with prejudice. Jennifer Schoewe's android cell phone was returned to her." *Exhibit 37* (internal paragraph numbers omitted).

86. Evidence that Richey was inclined to conspire with Schoewe to fabricate and/or destroy evidence related to Gischel also includes the direct and/or Indirect Evidence of Gender Motivations of UC's Special Victims Unit ("SVU") which Richey headed. For, as the head of this unit, Richey created a video in which he exhibited direct and/or Indirect Evidence

of Gender Motivations by suggesting the SVU believed male students like Gischel are presumed guilty. https://www.youtube.com/watch?v=Ba7Hx6Q8ur8&feature=youtu.be (accessed 6/22/17). For instance, Richey's video states the one message he wanted complainants to hear was: "We believe you." *Id.*

87. Upon information and belief, Richey, pursuant to direct and/or Indirect Evidence of Gender Motivations, was quick to apply the "we believe you" approach to a female, Schoewe – and against a male, Gischel. Evidence supporting this belief includes, but is not limited to Richey's decisions:

    (a)    To not advise Gischel that Schoewe's grabbing his penis was sexual assault and that Gischel could file a Title IX complaint against Schoewe; and/or

    (b)    to ignore his "mandatory reporter" obligations under UC Policies to report Schoewe's violations of UC's policies by grabbing Gischel's penis without receiving Gischel's permission to do so. *See e.g.*, *Exhibit 1*, p.38 (containing UC's Policies which state UC: "is proactive in our efforts to reduce sexual violence in all its forms and is intentional in our response to reports of sexual assault and other sexual violence by or against student and employees . . . [r]eporting is encouraged regardless of the gender of the survivor; the gender of the alleged perpetrators; and/or any relationship or lack thereof between them. . . . .").

88. Richey's interrogation of Gischel also evidenced direct and/or Indirect Evidence of Gender Motivations because Richey displayed archaic beliefs that men are more promiscuous than women and men enjoy sexual assault by women. Richey demonstrated these beliefs, in part, when he:

    (a)    Expressed sarcasm that Gischel would engage in a one night stand *Exhibit 7*, p.64;

    (b)    Stated a gentleman would not have sex with a woman he was walking home *Id.* p.73;

    (c)    Questioned how a drunken male could protect a young woman *Id.,* p.70;

    (d)    Was surprised that a college student on today's campus could engage in a hook up[12] *Id.,*p.64.

---

[12] It is reported that "Forty percent of the women in the study said they had experienced a hook-up. One in 10 reported having done so more than six times." http://abcnews.go.com/GMA/story?id=126813&page=1 (accessed 6/22/17)

(e)    Expressed wonder that Gischel would not expect a call from a young woman with whom he had hooked up. *Id. 7*, pp.72, 73.

89. Upon information and belief, when Richey interrogated Gischel on September 16, 2015- both Richey and Shaffer knew Gischel would be charged with violating UC's Policies related to Schoewe's complaint. Evidence supporting this belief includes, but is not limited to, Richey September 4, 2015 interview of Schoewe during which she made it clear she wanted to pursue both the Title IX complaint and the criminal complaint against Gischel. *Exhibit 7*, p. 9

90. Yet, on September 16, 2015, Richey did not advise Gischel a Title IX charge had been filed against him by Schoewe.

91. Similarly, upon information and belief, State Defendants' violations of UC Policies and Gischel's due process and Title IX rights occurred because of the direct and Indirect Gender Bias Motivations of Cummins. Evidence supporting this belief includes, but is not limited to, Cummins' decision to schedule the ARC hearing only after he was advised of an ORC investigation into UC's Title IX practices.

92. Furthermore, Cummins' motivations, included a fear of negative publicity or of Title IX liability.

93. Although State Defendants may contend UC Policies are gender neutral, this is a pretext for the direct and Indirect Gender Bias Motivations detailed in this Complaint which caused State Defendants to discipline innocent male students like Gischel via sexual misconduct proceedings that afford females preferential treatment in violation of Title IX and/or UC Policies. For, altogether, this Complaint manifests UC's pattern and practice of:

(a)    Providing preferential treatment to females – like Schoewe – who falsely allege they were sexually assaulted by male students like Gischel;

    (b)    Imposing presumptions against male students – like Gischel – who are falsely accused of sexual misconduct;

    (c)    Creating an unlawful hostile environment for male students like Gischel based on their gender; and/or

    (d)    Discriminating against male students to appease pressure from the federal government, UC's female student body, and/or the general public to discipline males students like Gischel even though the preponderance of the evidence proves these male students did not engage in sexual misconduct.

## §3: STATE DEFENDANT'S UNLAWFUL INVESTIGATION AND ERRONEOUS DISCIPLINE OF GISCHEL

94. As detailed below, State Defendants knew Schoewe and Gischel engaged in consensual sex on August 23, 2015 while (a) Gischel was intoxicated and Schoewe was not, or (b) Gischel and Schoewe were both intoxicated, but not incapacitated.

95. Schoewe flirted with Gischel throughout the evening in which she alleges Gischel assaulted her. *Exhibit 7*, p.44, 56, 66;

    (a)    Witnesses described Schoewe as kissing Gischel and/or as making out with him. *Id*., p.41, 56;

    (b)    Sometime around midnight, a group of students, including Gischel and Schoewe, decided go to Topper's Pizza for a late night snack- a distance of approximately .4 miles from the party they were attending. *Id*., p.38, 40, 41;

    (c)    As the group walked to Topper's, Schoewe walked hand in hand with Gischel and Gischel's friend, Ian Jensen. *Id.*, p.38, 43, 52;

    (d)    While waiting outside Topper's Pizza for everyone else to finish ordering, Schoewe grabbed Gischel's penis without Gischel's permission. *Id.*, p.66;

    (e)    Upon returning from Topper's Pizza, Schoewe decided to go home, accompanied by Gischel. *Id*., p.44, 47;

    (f)    On the way to Schoewe's apartment, Schoewe expressed her desire to go to Gischel's place; she and Gischel lay together in the grass outside Panera Bread, located approximately .8 miles from the party they had left and .4 miles from Schoewe's apartment. *Id.,* p.64, 66;

    (g)    Continuing on the walk to her apartment, Schoewe insisted that she and Gischel go to Gischel's apartment instead of her apartment; *Id.*, p.61, 73;

    (h)    As stated in Gischel's text to IJ, "she fucking insisted on" going to Gischel's apartment. *Id*., p.83;

    (i)    Upon arriving at Gischel's apartment, both walked up two and a half flights of stairs without assistance from each other;

    (j)    Once in the apartment, Gischel and Schoewe started kissing in the hallway at the top of the stairs;

(k)    Schoewe explicitly consented to intercourse when Gischel asked her "are you sure" and she answered "yes." *Id.*, p.63, 68;

(l)    Schoewe and Gischel engaged in vaginal intercourse. *Id.*, p.65;

(m)    Schoewe's non-verbal actions and responses were consistent with her verbal response of pleasure. *Id.*, p.63, 68, 74;

(n)    After intercourse, Schoewe and Gischel got up from the bed and left the bedroom.

(o)    Schoewe told Gischel he did not have to accompany her home since she wanted to attend another party. *Id.*, p.62;

(p)    Together they walked down two and a half flights of stairs to the front door of the apartment;

(q)    Schoewe again told Gischel she wanted to attend yet another party. *Id.*, p.63, 84;

(r)    Schoewe then either went to another party 2-3 blocks away or walked .4 miles back to her apartment, by herself, without assistance and without injury to herself.

(s)    The next morning when Schoewe's friends texted and asked if she had arrived home okay, she replied, "Yes." *Id.*, p.58.

100.  But, the next day, Schoewe became embarrassed by her conduct the night before and started doing research on date rape drugs.  *Schoewe Interview with UCPD* (9/4/15).

101.  Upon information and belief, Schoewe researched date rape drugs and ultimately decided to falsely accuse Gischel of sexual assault because Schoewe did not want others to know she voluntarily engaged in sexual interaction with Gischel.  Evidence supporting this belief includes, but is not limited to, the fact that Schoewe had a boyfriend who she called the morning after she voluntarily engaged in sexual interaction with Gischel. *Id.*

102.  After calling her boyfriend, Schoewe called her mother - Rebecca Schoewe – who called defendant Richey. *Id.*, p.5.  During this phone call Rebecca Schoewe provided Richey with the following information:

(a)    That Schoewe remembered drinking at 9:30 p.m. on August 22, 2015;

(b)    From 9:30 p.m. until noon the next day, Schoewe had no recollection of anything that happened;

(c)    When Schoewe awoke she had a headache and was dizzy and groggy;

(d)    Schoewe was missing some clothing items; andSchoewe expressed fear that her friends who hosted the party would get into trouble. *Exhibit 7*, p.7

103. The same day, August 25, 2015, Schoewe reported to defendant Jyl Shaffer that she was "drugged" between 10:30 p.m. on August 22, 2015 and 3:00 a.m. on August 23, 2015. She further reported to Shaffer that though "she consumed alcohol at the party [she] did not believe it was enough to make her black out. She said she lost all memory until she woke up in her apartment at 12:00 AM [sic] on the 23rd." *Id.,* p.2

104. Shaffer and Richey determined to "suspend any [Title IX] notifications on the incident until [they] found out about criminal prosecution." *Id.,* p.9

105. On September 4, 2015, Richey and Shaffer interviewed Schoewe, who stated the following:

    (a)    Schoewe assisted in making the jungle juice she consumed at the party in question;

    (b)    Schoewe left that party at 11:30 p.m. but has no memories after 11:30 p.m.;

    (c)    Schoewe described herself as neither incapacitated nor intoxicated. Rather, she stated that to say she was "tipsy" was an overstatement;

    (d)    Schoewe reported an "intense pelvic pain which lasted for approximately nine days";

    (e)    Schoewe felt disoriented when she woke up; and

    (f)    Schoewe reported her black laced leopard print underwear were missing. *Id.,* p. 9.

106. On September 4, 2015, Richey knew that Schoewe wanted to pursue the criminal charge as well as the Title IX complaint.

107. Nevertheless, on September 16, 2015, Richey interrogated Gischel which interrogation Shaffer transcribed. But, prior to the interrogation, neither Richey nor Shaffer told Gischel that he was the target of UC's investigation into Schoewe's Title IX complaint or that he was a suspect in a criminal investigation. As a result, Gischel had no idea that he was being investigated for either. Unaware of the dire consequences he faced, Gischel waived his Miranda rights and provided Richey information which included the following:

    (a)    "Everyone had been drinking quite a bit "We brought 3 or 4 cans of beer each, and I had that. There they had mixed, like, jungle juice, whatever you want to call

it. I had that….Probably a cup or two. I had a cup or two at ATO. … I was
intoxicated. *Exhibit 7,* p., 61;

(b)    Gischel left the party for approximately half an hour to an hour to attend yet

(c)    another party where he also drank alcohol and had difficulty walking back from the
party; *Id*., p.75;

(d)    Both Gischel and Schoewe joined the group that went to Topper's Pizza; *Id*., p.60;

(e)    Schoewe grabbed his penis as they walked to Topper's for pizza; *Id*., p.66;

(f)    Gischel understood Schoewe's grab as interest in having sex with him; *Id*., p.66;

(g)    Gischel and Schoewe conversed after they returned from Topper's and left the party
together, walking from the house party on Fairview Street through campus towards
Jefferson Street, to Panera Bread; *Id*., p.64, 66;

(h)    At Gischel's apartment, Schoewe again came on to Gischel and they started

(i)    kissing; *Id*., p.62, 66, 85;

(j)    As they began to engage in intercourse, Gischel asked Schoewe if she was sure she
wanted to have sex and she replied affirmatively; *Id.*, p.63;

(k)    As intercourse continued, Gischel again asked "are you sure" and she again

(l)    affirmatively replied; *Id*., pp. 68;

(m)    Gischel and Schoewe engaged in consensual sex; *Id*., p.62, 65;

(n)    After they finished engaging in the consensual sex, Schoewe wanted to attend
another party so Gischel walked Schoewe down the flight of stairs where she told
him he did not need to go with her to this party; *Id*., pp.62, 84, and;

(o)    Schoewe left Gischel's apartment alone at her own insistence and by her own
ability.

108. During Richey's interrogation, Richey asked Gischel what signs Schoewe provided
regarding wanting to have sex. *Id*., p.68. In response, Gischel stated: "[t]he whole like
wanting to go back to our place, her starting to kiss me, before, I don't remember exactly
what I said, I said something like: are you sure, or are you okay, before we actually started
having sex…in the bedroom. … In the bedroom, I asked "are you sure?" *Id.* Gischel also
stated that Schoewe was on top of him at one point. *Id.*, p.74.

109. On or about September 18, 2015, over three weeks after Schoewe's Title IX Complaint,
and two days after Richey's interrogation of Gischel, Shaffer finally sent Gischel the
Notice of Complaint regarding Schoewe's complaint. *Id*., p.20.

110. Upon information and belief, Shaffer's direct and/or Indirect Gender Bias Motivations
caused her to ask OUJA on October 2, 2015 to impose an interim suspension on Gischel

pending outcome of his disciplinary proceeding. In support of this request, Shaffer alleged Gischel posed an "ongoing risk to the campus as well as to Ms. Schoewe." *Exhibit 7*, pp. 26-27. Evidence supporting this belief includes, but is not limited to, the fact that Gischel had no prior history of university discipline and had been on campus the entire time from the alleged assault without incident.

111. On or about October 16, 2017, Cummins granted Shaffer's interim suspension request. *Exhibit 6,* pp.13-14. Cummins' decision to grant Shaffer's interim suspension request was motivated by direct or Indirect Gender Bias Motivations because – upon information and belief - UC does not impose interim suspensions on female students who are alleged to have engaged in sexual misconduct towards males. Evidence supporting this belief includes, but is not limited to, UC's decision not to impose an interim suspension on Schoewe when UC learned Schoewe grabbed Gischel's penis without permission.

112. On February 3, 2016, Shaffer sent her investigation report of Schoewe's complaint to Cummins even though Shaffer never interviewed Gischel as part of the Title IX investigation to ascertain his response to Schoewe's complaint.

113. Cummins then sent Gischel a letter advising him that Schoewe's complaint had been referred to the OUJA") for review. *Exhibit 6*, p.122 (containing 2/3/16 letter from Cummins to Gischel). Cummins' letter informed Gischel that a procedural review was scheduled for February 12, 2016 at which time Gischel's rights would be explained to him. *Id*.

114. Upon information and belief, prior to February 3, 2016, Schoewe notified UC that she intended to file a complaint with OCR alleging UC was not sufficiently disciplining male students like Gischel who were alleged to have engaged in sexual misconduct. Evidence

supporting this belief includes, but is not limited to, the fact that on February 9, 2016, UC received a notice from OCR that OCR was opening an investigation into UC because of an OCR complaint filed by Schoewe which complaint was filed with OCR on November 23, 2015. *Exhibit 4* (containing OCR notice to UC)

115. Neither during the February 12, 2016 procedural review, nor at any time prior to rejecting Gischel's internal appeal, did UC discuss with Gischel: (a) the fact that Schoewe filed a complaint with OCR, or (b) how UC intended to address conflicts of interest that existed between UC's promise to fairly and impartially adjudicate sexual misconduct claims and: (i) the direct or Indirect Gender Bias associated with Shaffer's NCHERM affiliation; (ii) the direct and/or Indirect Gender Bias Evidence UC was facing during the adjudication of Shoewe's complaint; or (ii) the fact that Cummins and/or Shaffer were likely targets of the OCR investigation into whether UC adequately protected Schoewe's Title IX rights.

116. On February 25, 2016, Cummins sent Gischel an email stating an ARC was going to determine if Gischel violated the Student Code of Conduct Policies. *Exhibit 6*, pp.50-52 (containing 2/25/2016 email from Cummins to Gischel). This letter identified the following alleged violations:

(a)    Violation of law;
(b)    Physical Abuse or harm;
(c)    Harassment or Discrimination; and
(d)    University Policies or Rules: UC Tile IX policies and statement on sex offenses. *Id.,*p.50

117. In the same February 25, 2016 letter, Cummins also set a March 15, 2016 ARC hearing which stated that additional evidence by Gischel for the hearing had to be made by February 29, 2016. *Id.* But, Cummins did not specify what kind of evidence could be brought.

118. The ARC hearing was held on March 15, 2015 at which Shaffer appeared at the hearing with Schoewe clearly implying support for Schoewe. The hearing lasted less than two hours.

119. During the hearing, both Schoewe and Gischel were given the opportunity to submit questions. Hearing chair defendant Brice Mickey asked Gischel almost all of Schoewe's questions. Gischel proffered 63 questions. But, Mickey and the ARC panel refused to ask Schoewe questions that Gischel proposed regarding two significant areas affecting the integrity of the investigation and the erroneous outcome ultimately reached by the ARC.

120. First, the ARC rejected Gischel's questions related to Richey's inappropriate conduct and/or bias. Second, ARC refused to ask Gischel's questions designed to explore the credibility flaws in Schoewe's incapacitation claim. Gischel's proffered questions on the relationship between Richey and Schoewe included:

(a)  Did you know or had you met Detective Richey before this incident?
(b)  After this incident did Detective Richey secure [for you] four football tickets to a UC football game, which was sold out?
(c)  Since this incident, have you called or texted Detective Richey between 1:00 A.M. and 5:00 A.M. in the morning?
(d)  How many times, approximately, have you and Detective Richey texted each other?
(e)  Why?
(f)  Did Detective Richey ever say 'I love you' to you?
(g)  Did Detective Richey ever give you a back rub?
(h)  Did Detective Richey ever give you any gifts?
(i)  Did Detective Richey ever give you a pendant?
(j)  Did you ever state on social media that your detective loves you?
(k)  Did Detective Richey ever text you saying 'I want to kiss you?'
(l)  Have you ever worn Detective Richey's police hat or jacket? *Exhibit 38* (containing proffered questions).

121. Since Gischel possessed evidence proving Richey and Schoewe engaged in the conduct addressed in these questions[13] Gischel would have been able to substantiate how Richey and Schoewe were conspiring to present false testimony against Gischel if Schoewe would have been required to answer these questions truthfully. Evidence supporting this belief includes, but is not limited to, the fact that Schoewe and Richey's obstructed justice in refusing to provide an Ohio court information about their private communications which caused that court to dismiss with prejudice criminal charges against Gischel. See generally, *Supra*, ¶¶84-86 (discussing same).

122. This is particularly true because the ARC also refused to ask Schoewe questions which would have disproved Schoewe's incapacitation allegations which were relied on extensively in State Defendant's erroneous discipline of Gischel. Regarding this issue, Gischel proffered the following questions which the ARC refused to ask Schoewe:

(a)   Did you vomit that night?
(b)   Did you fall down while you were at the party?
(c)   Did you fall down at all while walking to Topper's?
(d)   Were you carrying a purse or handbag that night?
(e)   Did you lose anything that was in your purse or handbag?
(f)   Did you take any prescription or non-prescription medicine the day of or the evening of the party?
(g)   Do you remember kissing Tyler that night at the party or at Topper's?
(h)   Did you feel embarrassed the next morning when you woke up?
(i)   Why?
(j)   Do you remember telling the nurses at University of Cincinnati Hospital that you do not drink alcohol?
(k)   Do you know there were no date rape type drugs found in your blood and urine testing?
(l)   Is this a case where you woke up the next morning and you simply regretted what you had done the night before with Tyler?
(m)   Did you drink too much that night?
(n)   Did you drink enough to be mentally impaired that night?
        *Exhibit 38*

---

[13] *See, Exhibit 43* (containing Instagram of Schoewe in defendant Richey's police hat and jacket and Richey Internal Investigation, which investigation resulted in his removal from the Special Investigations to Criminal Investigations, *Id.* p. 10)

123. The ARC's decision to refuse to ask Schoewe these questions allowed her to avoid having to acknowledge the following defects in her false allegations against Gischel:

(a)   The falsity of: (i) Schoewe's statement to her mother alleging Schoewe could not recall anything that happened between 9:30 p.m. and noon of the day after Schoewe interacted sexually with Gischel; given (ii) Schoewe's statement to Shaffer that Schoewe did not consume enough alcohol to make her black out; and (iii) Schoewe's admission that at 11:30 p.m. she felt completely in control of her senses and faculties. *Exhibit 7*, p. 7, 2, and 9 (containing said statements).

(b)   The contradiction between: (i) Schoewe's statement to Shaffer that Schoewe believed she was drugged between 10:30 p.m. and 3:00 a.m., and (ii) a toxicologist report which found no trace of drugs in Schoewe's system. Compare *Id.*, p.2 (containing Schoewe's statement to Shaffer), with *Exhibit 39* (containing Toxicology Report);[14]

(c)   The falsity of: (i) Schoewe's statement to Richey that Schoewe had no memory of events after 9:30 pm, given (ii) Schoewe's subsequent statements that she remembered she stopped drinking alcohol at 11:00 p.m.; and (iii) recalled that at 11:30 p.m. she felt in control of her senses and faculties. *Exhibit 7*, p. 7, 2, and 9 (containing said statements);

(d)   The contradiction between: (i) Schoewe's allegation that she was so intoxicated that she could not consent to sexual activity with Gischel even though Schoewe was sober enough she was able to, (ii) walk unaided from a party to a restaurant with Gischel, (iii) walk unaided back to a party from the restaurant; (iv) walk unaided to Gischel's and climb two and a half flights of steps to Gischel's apartment; (v) engage in sexual activity and then walk unaided back down two flights of steps – and then perhaps to another party – before walking home.

124. After prohibiting Gischel from exposing these defects in Schoewe's allegations and her conspiracy with Richey and/or Shaffer to prohibit the introduction of exculpatory evidence, the ARC erroneously found Gischel responsible of "violating provision(s) of the Student Code of Conduct specifically, Violation of Law,[15] Physical Abuse or Harm, Harassment or Discrimination, and Violation of University Policies or Rules, most specifically

---

[14] Upon information and belief, Richey and/or Shaffer knew about the existence of this toxicology report and other exculpatory evidence of Gischel's innocence, but allowed their direct and/or Indirect Gender Bias Motivations to cause them to withhold this evidence from individuals adjudicating Schoewe's Complaint. Evidence supporting this belief includes, but is not limited, the information in attorney Goldberg's affidavit in ¶84.

[15] Gischel had not at that time been, nor was he thereafter, found guilty of violating any law. All criminal charges were dismissed. *See, Exhibit 44* (containing Dismissal of Criminal Charge against Gischel).

University Policy Statement of Sex Offenses." *See, Exhibit 6*, pp.129-130 (containing March 28, 2015 letter from Assistant Vice President Rocco to Gischel)

125. On or about March 29, 2015, Gischel timely appealed the decision of the ARC ("Gischel's Appeal"). *Exhibit 6*, pp.38-39 (containing Gischel's Appeal). This appeal was based on State Defendants' violations of UC's Policies and Gischel's Title IX and/or due process rights. *Id*.

126. These violations included, but were not limited to: (a) the ARC Chair failing to permit Gischel to ask relevant questions related to the factual allegations and the credibility of Schoewe in the proceeding; (b) UC's failure to properly apply UC Policies' preponderance of the evidence standard, and (c) UC's refusal to allow Gischel to address the bias of Richey who was not present for cross examination even though Richey was the only one to directly interrogate Gischel. *Id*.

127. Upon information and belief, UC's Appeals Administrator defendant Rachel Smith ("Smith") allowed the direct and/or Indirect Gender Bias Motivations discussed in this Complaint to cause her to reject Gischel's Appeal on or about April 18, 2016. *Id.*, p.1 (containing Smith's 4/18/16 rejection of Gischel's Appeal). Evidence supporting this belief includes, but is not limited to, the fact that Smith's rationale for rejecting Gischel's appeal: (a) conflicts with the letter and spirit of UC's Policies,[16] while (b) embracing the demands articulated by internal and external groups and/or the OCR to provide preferential treatment to females like Schoewe when they made sexual assault allegations against male students like Gischel. *See generally, Supra*, ¶¶12-76 (discussing same).

---

[16] *Infra,* ¶¶135-146 (discussing same).

128. Additional evidence of this belief is found in Smith's rejection of Gischel's Appeal which suggested many of Gischel's questions which the ARC refused to ask Schoewe were irrelevant because there was no dispute that Schoewe was intoxicated. *Exhibit 6,* p.1 (containing Smith's 4/18/16 rejection of Gischel's Appeal). Smith's focus on "intoxication" - rather than UC Policies "incapacitation" standard [17] – erroneously embraces Indirect Gender Bias Manifestations of groups pressuring UC to find a female's consent to sexual contact could be retroactively retracted if she alleged she had been drinking alcohol or merely intoxicated. *See e.g., Supra,* ¶¶50-51 (discussing same).

129. Evidence supporting Gischel's belief that Indirect Gender Bias Manifestations motivated Smith's erroneous rejection of Gischel's Appeal is also found in Smith's allegation that the ARC's rejection of Gischel's written questions was proper because the ARC has unlimited "discretion to determine which questions it will ask." *Exhibit 6*, p.1. Smith's allegation contradicts the letter and spirit of UC Policies which would convey to a reasonable student like Gischel that he would be able to ask his accuser questions similar to those the ARC refused to ask in Gischel's case. *Infra,* ¶143 (discussing UC Policies related to Gischel's right to cross-exam witnesses who presented testimony against him). Smith states that Richey's interview of Gischel, the only interview of Gischel, was included in the Title IX file, and considered by the ARC. However, Smith implies that the presence of another officer somehow removed Richey's bias and credibility. The censored questions went to the heart of Richey's and Schoewe's credibility as witnesses in light of the alleged relationship.

---

[17] *Infra,* ¶¶144-149 (discussing same).

130. Smith's decision to affirm the ARC's refusal to ask Gischel's questions also evidences a desire to curry favor with groups and organizations holding direct and/or Indirect Gender Bias Motivations to pressure State Defendants to limit cross-examination during disciplinary proceedings and/or to "believe" the story told by the female "victim" of alleged sexual misconduct. *See e.g.*, *Supra,* ¶¶79-88. (Discussing same).

131. As a result, Smith's denial of Gischel's Appeal violated UC Policies and Gischel's due process and Title IX rights in part because Smith allowed direct and/or Indirect Gender Bias Motivations to cause her to affirm the ARC's refusal to allow Gischel prove the preponderance of the evidence disproved Schoewe's allegations. *See generally*, *Infra,* ¶§4 (discussing State Defendant's violations of UC Policies and Gischel's due process and Title IX rights).

## §4: UC'S INVESTIGATION AND DISCIPLINARY PROCEEDINGS VIOLATED UC POLICIES AND GISCHEL'S TITLE IX AND DUE PROCESS RIGHTS

132. The direct and Indirect Gender Bias Evidence detailed in this Complaint motivated State Defendants to take the following actions: (a) impose an unlawful interim suspension of Gischel; (b) expel him from UC; (c) permanently ban Gischel from all UC properties; and (d) impose a seven-year notation on his academic record detailing UC's disciplinary findings. See, *Exhibit 6*, p.84 (containing Cummins' 2016 letter to Gischel which states in part: "Disciplinary dismissal permanently prohibits the student from attending the university and from being present, without permission, on any university owned, leased or controlled property.").

133. State Defendants took these action even though State Defendants knew Schoewe voluntarily engaged in sexual contact with Gischel when: (a) Gischel was intoxicated and

Schoewe was not, or (b) Gischel and Schoewe were both intoxicated, but not incapacitated. In doing so, UC violated UC's policies and Gischel's Title IX and due process rights.

134. For example, State Defendant's conduct detailed in this Complaint establishes State Defendants violated UC Policies and/or Gischel's due process and/or Title IX rights in at least nine ways. Upon information and belief, these violations occurred because of: (a) direct and/or Indirect Gender Bias Motivations harbored by State Defendants and/or (b) pressure from OCR, UC students, UC campus groups, and/or the general public to provide preferential treatment to females who alleged male students engaged in sexual misconduct.

135. First, State Defendants violated the "preponderance of evidence" standard which UC policies and OCR required prior to finding Gischel responsible. *Exhibit 1*, p.7 (containing UC Policies' "preponderance of evidence" requirement); 2011 Dear Colleague Letter, at 33 (containing OCR's "preponderance of evidence" requirement). This occurred in part because State Defendants: (a) ignored testimony from Schoewe and her witnesses which disproved her allegations; and (b) refused to ask Schoewe questions that would have disproven Schoewe's allegations and/or exposed a conspiracy between Schoewe, Richey, and/or Shaffer to prohibit individuals adjudicating Schoewe's complaint from receiving evidence establishing Gischel's innocence. *Supra,* ¶¶119-123 (discussing same). As a result, State Defendants violated UC Policies and/or Gischel's due process or Title IX rights.

136. Second, State Defendants violated Gischel's UC Policies and/or Gischel's due process or Title IX rights by not complying with the "prompt, reliable, impartial" adjudication of Schoewe's complaint required by UC Policies and OCR. Compare, *Exhibit 1*., p.7, 43 (containing UC's Policies' promise of a "prompt, reliable, impartial" which generally

should be completed 60 days after a complaint is filed) and OCR's 2014 Questions and

Answers on Title IX and Sexual Violence, pp.19, 38 (stating that sexual assault allegations

be adjudicated in a "adequate, reliable, and impartial investigation of complaints, including

the opportunity for both the complainant and alleged perpetrator to present witnesses and

evidence" generally within 60 days after a complaint is filed.

https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (accessed 6/22/17)

with *Supra,* ¶¶25-26 (discussing how direct and Indirect Gender Bias Motivations caused

State Defendants to engage in a 7 month biased adjudication of Schoewe's complaint).

137. Third, Richey's September 16, 2015 interrogation of Gischel violated The Violence

against Women Reauthorization Act ("VAWA")[18] and the Clery Act[19] which required

Richey and/or Shaffer to inform Gischel that he had the right to an "advisor" during this

interrogation because the statements he made could be used in UC's prosecution of Gischel

for violating UC's sexual misconduct policies.

138. Upon information and belief, Richey and Shaffer also violated UC Policies and/or

Gischel's due process or Title IX rights by intentionally withholding notice of UC's intent

to file a Title IX Complaint against Gischel so he would not exercise his right to an

---

[18] *See e.g.,* SEC. 304. CAMPUS SEXUAL VIOLENCE, DOMESTIC VIOLENCE, DATING, VIOLENCE, AND STALKING EDUCATION AND PREVENTION. VAWA ( stating the accuser and the accused in campus sexual misconduct proceedings are entitled to the same opportunities to have others present during an institutional disciplinary proceeding, including the opportunity to be "accompanied to any related meeting or proceeding by an advisor of their choice."); This "advisor of choice" can be an attorney as detailed in the Federal Register/Violence Against Women Act which states: "At the outset of the discussion of this issue, the Department made clear that its interpretation of the statutory language was that the *accused* and the accuser are *entitled to an advisor of their choice*, *including an attorney*… [and] that the institution cannot limit the choice or presence of advisor for either the accuser or the accused in any meeting or institutional disciplinary proceeding."

[19] *20 U.S.C. §1092(f)(8)(B)* (containing the Clery Act which states**:** "the accuser and the accused are entitled to the same opportunities to have others present during an institutional disciplinary proceeding, *including the opportunity to be accompanied to any related meeting or proceeding by an advisor of their choice*."

"advisor" during Richey's interrogation. Evidence supporting this belief, includes, Richey and Shaffer's violation of UC Policies which mandated that:

> "Upon receipt of notice that a Title IX complaint has been filed, [Gischel was to be] encouraged to consult with an advisor of [his] choice . . . [a]dvisors can help explain policies and procedures, provide support during meetings with the university as part of the investigation and adjudication of the complaint, and consult with respondents as they prepare documents in support of their case." *https://www.uc.edu/titleix/Resources/assistance-for-individuals-who-are-accused.html* (accessed 6/25/17)

139. Richey and/or Shaffer's decision to withhold this information from Gischel cannot be attributed to criminal charges they may have believed would follow Richey's interrogation of Gischel. This is because OCR's 2011 Dear Colleague Letter mandated that UC: (a) "should not wait for the conclusion of a criminal investigation or criminal proceeding to begin its own Title IX investigation" and (b) any "Memorandum of Understanding" that UC might have "with a local police department must allow [UC] to meet its Title IX obligation to resolve complaints promptly and equitably." 2011 Dear Colleague Letter, p. 10.

140. Fourth, Richey and/or Shaffer violated UC Policies and/or Gischel's due process or Title IX rights by not providing Gischel "notice of" the contents of Schoewe's complaint prior to Richey's interrogation of Gischel as required by UC Policies. *Exhibit 1*, p.20, 21 (containing UC's Policies requiring said "notice"). Had UC honored this requirement, Gischel would have understood the gravity of Schoewe's false allegations and obtained an "advisor" to represent him during Richey's interrogation.

141. Instead of complying with this notice requirement, UC withheld from Gischel the notice of Schoewe's complaint or Gischel's right to an "adviser" or "attorney" until September 18, 2015 - three weeks after UC received Schoewe's complaint. *Exhibit 7,* pp.21

(containing UC's September 18, 2015 letter to Gischel). Therefore, even though Richey advised Gischel of his Miranda rights prior to Richey's interrogation, these rights were meaningless to Gischel because Richey did not tell Gischel he was suspected of engaging in sexual assault or a Title IX violation.

142. Fifth, State Defendants violated UC Policies and due process and/or Title IX rights by failing to honor UC Policies' requirement that Gischel be provided a "meaningful opportunity [to] respond to Schoewe's complaint. *https://www.uc.edu/titleix/Resources/assistance-for-individuals-who-are-accused.html* (accessed 6/26/17). This is partly because: (a) Gischel did not know the details of Schoewe's complaint when Richey engaged in his clandestine interrogation of Gischel, and (b) Shaffer never interviewed Gischel to obtain his defense to Schoewe's complaint after Gischel was presented with the allegations in that complaint.

143. Sixth, as detailed in ¶¶ 119-123 above, State Defendants also prohibited Gischel's right to meaningfully respond to Schoewe's complaint by violating Gischel's rights to question Richey and Schoewe at Gischel's disciplinary hearing. The right to engage in this questioning is contemplated in the following provisions of UC Policies and OCR mandates:

> SCOC § (b)(iii)(c) The accused and the complainant shall have the right to submit evidence and written questions to be asked of all adverse witnesses who testify in the matter. The hearing chair, in consultation with the ARC, has the right to review and determine which written questions will be asked. *Exhibit 1*, p.25; and

> OCR's mandate that "…if the school allows one party to cross-examine witnesses, it must do so equally for both parties." "Questions and Answers on Title IX and Sexual Violence", p. 38. ("Q & A on Title IX) https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf. (accessed 6/22/2017).

144. Seventh, State Defendants violated UC Policies and Gischel's due process and/or Title IX rights by erroneously evaluating alcohol's role in whether Gischel and Schoewe engaged in consensual sexual interactions.  UC Policies state in the Title IX Policies and Procedures that:

> "***Consent*** is informed, freely given, mutual, and can be withdrawn at any time. A person cannot give consent if he or she is mentally or physically incapacitated or impaired such that the person cannot understand the fact, nature or extent of the sexual situation; this includes impairment or incapacitation due to age, alcohol or drug consumption, or being asleep or unconscious.
> "*Exhibit 1,* p. 38

145. The same policy also cites that "Legally, consent cannot be given while intoxicated or medicated since these states inhibit an aware state of mind." *Id.,* p.54  But, UC Policies offer no further definition of how the terms "incapacitated," "impaired" or "intoxicated" are defined.

146. UC's failure to specifically define these terms is contrary to guidance issued by: (A) the Association for Student Conduct Administration in its Student Conduct Administration & Title IX: Gold Standard Practices for Resolution of Allegations of Sexual Misconduct on College Campuses,"[20]  and (B) guidance provided by the Obama Administration.  *See e.g*., www.notalone.gov  (accessed 6/22/17) (containing the Obama Administration's checklist and model definitions of prohibited conduct as well as terms – like incapacitation – which should be defined in universities' policy).

147. Nevertheless, upon information and belief, State Defendants knew direct or Indirect Gender Bias Motivations caused State Defendants to put their thumb on the scale of justice in erroneously finding Schoewe was too incapacitated to engage in consensual sexual contact with Gischel.  Evidence supporting this belief includes, but is not limited to, UC's

---

[20] http://www.theasca.org/files/Publications/ASCA%202014%20Gold%20Standard.pdf (accessed 6/22/17), p.25.

affiliation with ATIXA and NCHERM which has a long history of favoring the accuser over the accused. *Supra*, ¶¶71-74 (discussing same). But, as evidenced in the Open Letter from the NCHERM Group, *Exhibit 40,* even NCHERM recently acknowledged colleges have been engaging in "gender discrimination" by putting their "thumbs on the scales of justice" in favor of females alleging sexual assault when "[a] tie [regarding whether incapacitation existed] must go to the accused [male] student." *Id*. p. 8

148. State Defendants ignored evidence disproving Schoewe's self-serving "assertion[s] of her own incapacity, blackout or lack of memory. *See e.g.*, *Supra*, ¶¶81, 103, 123 (detailing some the evidence State Defendants possessed disproving Schoewe's allegations that she was incapacitated and/or blacked-out because of her alcohol consumption or drugs).

149. State defendants also refused to ask Gischel's questions of Schoewe and/or Richey which would have exposed a likely conspiracy between Schoewe, Richey, and or Shaffer to put their collective "thumbs on the scale" so Gischel would erroneously be found responsible. *See e.g.*, *Supra*, ¶¶119-123 (discussing same).

150. Eighth, State Defendants violated Gischel's rights under OCR mandates that "both parties" in sexual misconduct disciplinary proceedings "should be given periodic status updates throughout the process." Questions and Answers on Title IX and Sexual Violence (PDF); https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (accessed 6/22/17), p. 145. Here, Gischel was provided incorrect status updates regarding UC's investigation. *See e.g., Exhibit 6*, p.120 (containing UC's incorrect status update regarding UC's investigation of Schoewe's allegations). Shaffer advised Gischel that the investigation would close by November 30th. In fact, she did not send the file to OUJA until February 3, 2016. This incorrect update prejudiced Gischel's ability to defend himself.

151. In engaging in the conduct detailed in this Complaint, State Defendants allowed direct or Indirect Gender Bias Motivation to violate UC Policies and Gischel's due process and Title IX Rights. This occurred even though to ensure a fair and impartial proceeding, "[e]ach case must be decided on its own merits, according to its own facts. [For if] a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision." *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561 (D. Mass. 2016) (emphasis added).

152. State Defendants also allowed direct or Indirect Gender Bias Motivations to presume males students like Gischel "guilty" while providing preferential "victim" status to female students like Schoewe. However, "whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning." *Id.*

153. Finally, State Defendant's violated UC Policies and/or Gischel's rights under Title IX by not charging Schoewe with violating UC Policies by grabbing Gischel's penis without his permission. *Supra,* ¶¶80, 82, 87, 111 (discussing same). Individual Defendants should have investigated and disciplined Schoewe for this conduct because they possessed mandatory reporting obligations under UC Policies. *See e.g.*, *Exhibit 1*, p.49 (stating UC: "is proactive in our efforts to reduce sexual violence in all its forms and is intentional in our response to reports of sexual assault and other sexual violence by or against student and employees . . . [r]eporting is encouraged regardless of the gender of the survivor; the gender of the alleged perpetrators; and/or any relationship or lack thereof between them. . . . .") and *Exhibit 42[21]* (containing power point Spring 2015 Training: "What do we have

---

[21] *Exhibit 41,* has been omitted.

to report? … Even if you think the story isn't true; Even if the person telling you about it doesn't think it's misconduct or discrimination.") *Id. p.* 13

COUNT 1:
VIOLATION OF TITLE IX –HOSTILE ENVIRONMENT SEXUAL HARASSMENT
AND/OR DISCRIMINATION
(AGAINST UC ONLY)

154. Gischel realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

155. Pursuant to 20 U.S.C. § 1681, Title IX is a federal statute designed to prevent sexual discrimination and/or harassment in educational institutions receiving federal funding.

156. Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations. Title IX provides in pertinent part: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances.

157. UC receives federal financial assistance and is thus subject to Title IX.

158. Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

159. Both the DOE and the DOJ have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable

resolution of student…complaints alleging any action which would be prohibited by" Title IX or its regulations. 34 C.F.R. § 106.8(b) (Department of Education); 28 C.F.R. § 54.135(b) (Department of Justice).

160. Title IX mandates UC afford equitable procedures and due process to Gischel which includes, but is not limited to: (a) having proper jurisdictional authority to conduct an investigation; (b) providing prompt, adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence, and/or (c) that UC employees involved in the conduct of the procedures have adequate training.

161. UC knew, or in the exercise of due care should have known, that UC lacked jurisdiction under UC Policies to investigate and/or discipline Gischel for a physical encounter Schoewe initiated with Gischel when they were both impaired by alcohol.

162. Upon information and belief, UC knew, or in the exercise of due care should have known, employees including, but not limited to, Individual Defendants lacked training and ability to carry out their responsibilities under the disciplinary enforcement requirements of Title IX.

163. Upon information and belief, UC failed to provide adequate Title IX training to Individual Defendants, in violation of Title IX guidelines that "[a]ll persons involved in implementing a school's grievance procedures (e.g., Title IX coordinators, others who receive complaints, investigators, and adjudicators) must have training or experience in handling sexual violence complaints, and in the operation of the school's grievance procedures. The training should include information…how to determine credibility; how to evaluate evidence and weigh it in an impartial manner." Questions and Answers on Title IX and

Sexual Violence, p. 47  http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf  (accessed 6/22/17).

164. Evidence supporting this belief includes, but is not limited to direct and/or Indirect Gender Bias Evidence in UC's training materials detailed in ¶67 above.

165. UC's policies fail to meet the standards required by Title IX and/or Due Process safeguards in the United States Constitution as interpreted by United States' courts regarding how institutions of higher education conduct disciplinary proceedings.

166. Upon information and belief, in virtually all cases of campus sexual misconduct by UC students, the accused student is male and the accusing student is female.

167. As detailed throughout this Complaint, UC created an environment in which male students accused of sexual assault, such as Gischel, are fundamentally denied due process as to be virtually assured of a finding of guilt. Such a biased and one-sided process deprives male UC students like Gischel of educational opportunities on the basis of their gender.

168. Upon information and belief, UC's investigation and/or discipline of Gischel was taken in order to demonstrate to DOE, DOJ, OCR, former President Obama's Administration, and/or the general public that UC is aggressively disciplining male students accused of sexual assault.

169. UC has actual or constructive knowledge that UC's investigation and/or discipline of Gischel posed a persuasive and unreasonable risk of gender discrimination with regard to Gischel.

170. UC's actions and inactions detailed above and below set in motion a series of events that UC knew, or reasonably should have known, would cause male UC students, such as Gischel, to suffer unlawful gender discrimination.

171. UC's investigation and/or discipline of Gischel is discriminatory and based upon or motivated by Gischel's male gender.

172. The male gender discrimination by UC against Gischel includes, but is not limited to, providing preferential treatment to Schoewe. This preferential treatment includes, but is not limited to UC's refusal to discipline Schoewe pursuant to UC's policies detailed above.

173. UC employees, including but not limited to Individual Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) UC's violations of Gischel's rights under UC Policies, Title IX, and/or guidance promulgated by ORC; and/or (b) UC's unlawful determination that Gischel violated UC Policies which UC adopted pursuant to federal laws and regulations related to Title IX.

174. UC employees, including but not limited to Individual Defendants, exhibited deliberate indifference by refusing to remedy: (a) UC's violations of Gischel's rights under UC Policies, Title IX, and/or guidance promulgated by ORC; and/or (b) UC's erroneous determination that Gischel violated UC Policies which UC adopted pursuant to federal laws and regulations related to Title IX; and/or refusing to discipline Schoewe for her violations of UC's policies regarding her decision to grab Gischel's penis without his consent.

175. UC's deliberate indifference caused Gischel to suffer sexual harassment and/or discrimination so severe, pervasive or objectively offensive that it deprived Gischel of access to educational opportunities or benefits (and) caused other harms detailed above.

176. Upon information and belief, UC possesses additional documentation evidencing UC's unlawful pattern of gender biased decision making which favors female students over male students like Gischel who are falsely accused of sexual assault. Evidence supporting this

allegation includes, but is not limited to, UC's failure to respond to Gischel's public records request.

177. UC's hostile environment sexual harassment and/or discrimination caused Gischel to be damaged in an amount to be determined at trial.

COUNT 2:
VIOLATION OF TITLE IX – DELIBERATE INDIFFERENCE
(AGAINST UC ONLY)

178. Gischel realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

179. UC employees, including but not limited to Individual Defendants, acted with deliberate indifference towards Gischel because of his male gender.

180. UC employees, including but not limited to Individual Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) UC's violations of Gischel's rights under UC's policies, Title IX, and/or guidance promulgated by ORC; and/or (b) UC's erroneous determination that Gischel violated UC's policies which UC adopted pursuant to federal laws and regulations related to Title IX.

181. UC employees, including but not limited to Individual Defendants, exhibited deliberate indifference by refusing to remedy: (a) UC's violations of Gischel's rights under UC Policies, Title IX, and/or guidance promulgated by ORC; and/or (b) UC's erroneous determination that Gischel violated UC Policies which UC adopted pursuant to federal laws and regulations related to Title IX.

182. Upon information and belief, UC possesses additional documentation evidencing its employees and/or agents' manifest gender based deliberate indifference towards Gischel and/or other similarly situated male students.

183. UC's deliberate indifference caused Gischel to be damaged in an amount to be determined at trial.

COUNT 3
VIOLATION OF TITLE IX – ERRONEOUS OUTCOME
(AGAINST UC ONLY)

184. Gischel realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

185. UC employees, including but not limited to Individual Defendants, unlawfully disciplined Gischel because of his male gender.

186. By erroneously disciplining Gischel, UC violated UC Policies, Title IX, and/or guidance promulgated by OCR.

187. UC employees, including but not limited to Individual Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) UC's violations of Gischel's rights under UC Policies, Title IX, and/or guidance promulgated by ORC; and/or (b) UC's erroneous determination that Gischel violated UC Policies which UC adopted pursuant to federal laws and regulations related to Title IX.

188. UC employees, including but not limited to Individual Defendants, exhibited deliberate indifference by refusing to remedy: (a) UC's violations of Gischel's rights under UC Policies, Title IX, and/or guidance promulgated by ORC; and/or (b) UC's erroneous determination that Gischel violated UC Policies which UC adopted pursuant to federal laws and regulations related to Title IX.

189. UC's conduct detailed above involved arbitrary and capricious violations of Gischel's Constitutional Due Process rights.

190. Upon information and belief, UC possesses additional communications evidencing UC's deliberate indifference in imposing unlawful discipline on Gischel on the basis of his gender.

191. UC's wrongful discipline of Gischel caused Gischel to be damaged in an amount to be determined at trial.

WHEREFORE, regarding Counts 1-3, Gischel demands judgment and relief against UC as follows:

    (a)    Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate Gischel' past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

    (b)    Order(s) requiring UC expunge Gischel's official UC files of all information related to his interactions with Schoewe;

    (c)    Judgment for attorneys' fees, pursuant to any applicable statute;

    (d)    Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

    (e)    Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

    (f)    Such other and further relief as this court may deem just, proper, equitable, and appropriate.

## COUNT 4
### VIOLATION OF THE PROCEDURAL AND SUBSTANTIVE COMPONENT OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. §1983 (AGAINST STATE DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR INJUNCTIVE RELIEF (AND) IN THEIR PERSONAL CAPACITY FOR MONEY DAMAGES)

192. Gischel realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

193. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Fourteenth

Amendment due process protections are required in higher education disciplinary proceedings.

194. Individual Defendants are considered state actors who owe Gischel certain protections pursuant to the Fourteenth Amendments to the United States Constitution and other Constitutional provisions.

195. Individual Defendants' conduct detailed in this Complaint violated Gischel's Due Process rights in part by denying Gischel the "fundamentally fair [disciplinary] procedures" required by United States Supreme Court decisions such as *Goss v. Lopez*, 419 U.S. 565 (1975).

196. Individual Defendants' conduct detailed in this Complaint violated Gischel's Due Process rights in part by irreparably damaging Gischel's right to pursue an education and future educational and employment opportunities and occupational liberty. See e.g., *Dixon v. Alabama State Board of Education,* 294 F.2d 150, cert. denied, 368 U.S. 930, 82 S. C.368, 7 L.Ed.2d 193 (1961)(stating, "[i]t requires no argument to demonstrate that education is vital and, indeed, basic to civilized society . . . [i]t is most unlikely that a public college would accept a student expelled from another public college of the same state. Indeed, expulsion may well prejudice the student in completing his education at any other institution. Surely no one can question that the right to remain at the college in which the plaintiffs were students in good standing is an interest of extremely great value."

197. Individual Defendants' conduct violated Gischel's protected property interest in his education (and) right to pursue an education and future educational and employment opportunities and occupational liberty.

198. Individual Defendants violated Gischel's Due Process rights in part because Gischel was denied a review by a gender-neutral and impartial decision maker.

199. Individual Defendants violated Gischel's Due Process rights in part because Gischel was denied a "meaningful" opportunity to clear his name. *See e.g.*, *Matthews v. Eldridge*, 492 U.S. 319, 333 (1976) (requiring disciplinary procedures that take place "at a meaningful time and in a meaningful manner.").

200. Individual Defendants violated Gischel's Due Process rights in part because Individual Defendants' prohibited Gischel from accessing information necessary for his defense and/or internal appeal.

201. Individual Defendants violated Gischel's Due Process rights in part because Individual Defendants' conduct evidenced arbitrary and/or irrational behavior which was not justified by any governmental interest.

202. Individual Defendants violated Gischel's Due Process rights in part because Individual Defendants' conduct was motivated by ill will, bad faith, and/or an intent to injure Gischel.

203. Individual Defendants violated Gischel's Due Process rights in part because they engaged in the arbitrary abuse of executive power so egregious that it shocks the conscience of the public. 195.    Evidence of this fact is contained in publications criticizing academics for violating the Due Process rights of male college students in the same – or similar way – that Individual Defendants violated Gischel's Due Process. *See e.g., Supra*, ¶¶28 (referencing said publications).

204. Individual Defendants violated Gischel's Due Process rights in part because Gischel would not have been disciplined had Individual Defendants acted in a gender-neutral manner.

205. Individual Defendants violated Gischel's Due Process rights in part because Individual Defendants' engaged in a gender-biased pattern and/or practice of disregarding and violating the rights of male students such as Gischel when these males were accused of sexually assaulting a female student.

206. Individual Defendants acted, or failed to act, under color of law, to deprive Gischel's rights and privileges secured by the Fourteenth Amendments to the United States Constitution and other Constitution provisions.

207. Individual Defendants' conduct evidenced an intentional, outrageous, and/or reckless disregard for Gischel's constitutional rights.

208. Individual Defendants' conduct towards Gischel lacked any rational basis and/or was motivated by ill will or bad faith.

209. As a result of Individual Defendants' Due Process violations, Gischel was suspended and suffers ongoing harm, including but not limited damage to his future educational and employment opportunities (and) and his standing and reputation which is marred in part by Individual Defendants' unlawful finding that Gischel engaged in sexual misconduct.

210. Individual Defendants' investigation and/or discipline of Gischel deprived Gischel of his interests within the meaning of "life, liberty, or property" contained in U.S. Const. amend. XIV, § 1 in part because Individual Defendants violated Gischel's property right to a transcript unmarred by Defendants' unlawful investigation and/or discipline of Gischel.

211. Upon information and believe, Individual Defendants agreed to, approved, and/or ratified the various violations of Gischel's Due Process rights detailed in this Complaint.

212. Individual Defendants had actual or constructive knowledge that they were engaging in conduct creating a pervasive and unreasonable risk of deprivation of Gischel's rights under the Fourteenth Amendments to the United States Constitution.

213. Because of Individual Defendants' unlawful actions, Gischel is entitled to injunctive relief that requires Individual Defendants expunge Gischel's official UC student file of all information related to his sexual encounter with Schoewe.

214. Because of Individual Defendants' unlawful actions, Gischel is entitled to declaratory relief that requires Individual Defendants' expunge Gischel's official UC student file of all information related to his encounter with Schoewe.

<u>COUNT 5:</u>
<u>VIOLATION OF EQUAL PROTECTION CLAUSE</u>
<u>OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES</u>
<u>CONSTITUTION PURSUANT TO 42 U.S.C. §1983</u>
<u>(AGAINST INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR</u>
<u>INJUNCTIVE RELIEF (AND) IN THEIR PERSONAL CAPACITY FOR MONEY</u>
<u>DAMAGES)</u>

215. Gischel realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

216. The Fourteenth Amendment to the United States Constitution prohibits gender discrimination.

217. As evidenced by the facts and exhibits detailed above, gender discrimination improperly caused Individual Defendants to unlawfully find Gischel responsible for engaging in sexual misconduct with Schoewe.

218. Upon information and belief, female UC students suffer no historical disadvantage regarding the discernment of consent to intimate physical relationships with male students

which would allow Individual Defendants to validly discriminate against male students like Gischel.

219. Gischel brings these claims pursuant to 42 U.S.C. § 1983 because Individual Defendants' actions were taken by Individual Defendants under color of state law.

220. Because of these violations, Gischel has suffered considerable emotional distress, loss of present and future earnings, humiliation, and damage to his reputation as a result of Individual Defendants' actions.

COUNT 6
MALICIOUS PROSECUTION UNDER THE FOURTH AMENDMENT TO THE
UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983
(AGAINST RICHEY IN HIS OFFICIAL CAPACITY FOR INJUNCTIVE RELIEF
(AND) IN HIS PERSONAL CAPACITY FOR MONEY DAMAGES)

221. Gischel realleges and incorporates all the allegations contained in the preceding paragraphs of this Complaint as though fully rewritten herein.

222. The Fourth Amendment to the United States Constitution prohibits malicious prosecution.

223. A criminal prosecution was initiated against Gischel.

224. Richey acted under color of state law pursuant to 42 U.S.C. § 1983 in making, influencing or participating in the decision to prosecute.

225. There was a lack of probable cause for the criminal prosecution.

226. As a consequence of the criminal proceeding, Gischel suffered a deprivation of liberty.

227. The criminal proceeding was resolved in Gischel's favor.

228. As a result of the malicious prosecution, Gischel has suffered damages, including but not limited to, emotional distress, loss of present and future earnings, humiliation, and damage to his reputation as a result of [insert defendant's] actions.

WHEREFORE, regarding Counts 4-6, Gischel demands judgment and relief as follows:

(a)     Individual Defendants be found liable in their official capacities to Gischel for injunctive relieve requiring UC expunge Gischel's official UC files of all information related to his interactions with Schoewe;

(b)     Individual Defendants be found liable in their personal capacities for money damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate Gischel' past and future pecuniary and/or non-pecuniary damages caused by Individual Defendants' conduct;

(c)     Judgment for attorneys' fees, pursuant any applicable statute;

(d)     Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

(e)     Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

(f)     Such other and further relief as this court may deem just, proper, equitable, and appropriate.

COUNT 7:
DECLARATORY JUDGMENT -
VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES AND OHIO
CONSTITUTIONS
(AGAINST UC AND INDIVIDUAL DEFENDANTS)

229. Gischel realleges and incorporates all the allegations contained in the preceding paragraphs of the Complaint as though fully rewritten herein.

230. The Fifth Amendment to the United States Constitution, made applicable to the State of Ohio by the Fourteenth Amendment, provides that no person shall be deprived of life, liberty, or property, without due process of law."

231. The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

232. Section 16, Article I, Ohio Constitution, guarantees that every person injured in his lands, goods, person or reputation shall have remedy by "due course of law."

233. The Due Process Clauses of the Ohio and United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under the UC Policies.

234. State Defendants have a constitutional obligation to provide a fundamentally fair and reliable hearing process.

235. State Defendants have an additional obligation under the Ohio Administrative Code to provide a hearing process that is consistent with the customs of a free society, which includes recognition of the basic due process rights of students.

236. Gischel is entitled under the Constitutions of Ohio and the United States, as well as under the Ohio Administrative Code, to the opportunity to be heard in a meaningful manner at the UC ARC Hearing.

237. Gischel's interests in the results of the ARC are significant:

(a)     Permanent expulsion and the notation of permanent expulsion from UC on Gischel's transcript denies Gischel the benefits of his education at UC;

(b)     Permanent expulsion and the notation of permanent expulsion from UC on Gischel's transcript damages Gischel's academic and professional reputation; and

(c)     Permanent expulsion and the notation of permanent expulsion from UC on Gischel's transcript has and will continue to affect Gischel's ability to enroll at other institutions of higher education and to pursue his chosen career.

238. State Defendants have violated Gischel's due process rights in the following manner:

(a)     UC and Individual Defendants conducted biased investigations, which were then provided to the ARC;

(b)     UC and Individual Defendants permitted the use of hearsay evidence at the Hearing without providing Gischel the opportunity to effectively cross-examine witnesses;

(c)     State Defendants did not apply the UC Polices properly, including the definition of consent as set forth in UC's Policies and did not apply the appropriate definitions of key legal terms.

(d)     Gischel was denied the effective assistance of an attorney or other advisor. An advisor was permitted to be present, but the advisor was not permitted to participate.

(e)     Gischel was not presumed to be "innocent until proven guilty." Instead, State Defendants determined that the party seeking to impose responsibility on a student does not have the burden of proof.

239. Gischel and State Defendants have a dispute about whether UC Policies as applied to Gischel violates the Due Process Clauses of the United States Constitution, the Due Course

of Law Clause of the Ohio Constitution, and the requirement of the OAC that any hearing process be consistent with the customs of a free society.

240. Gischel is entitled to a declaration that the UC Student Code of Conduct, as applied to Gischel, violated the Due Process Clause of the United States Constitution, the Due Course of Law Clause of the Ohio Constitution, and the requirement of the OAC that any hearing process be consistent with the customs of a free society.

241. Gischel is entitled to a declaration that the UC Code of Student Conduct, as applied to Gischel, violated the Due Process Clauses of the United States Constitution, the Due Course of Law Clause of the Ohio Constitution, and the requirement of the OAC that any hearing process be consistent with the customs of a free society.

242. Pursuant to 42 U.S.C. §1988, Gischel is entitled to his attorney's fees incurred in bringing this action.

WHEREFORE, regarding Counts 7 Gischel demands judgment and relief against UC and/or State Defendants as follows:

(a) Order(s) requiring UC and/or State Defendants expunge Gischel's official UC files of all information related to his interactions with Schoewe;
(b) Judgment for attorneys' fees, pursuant any applicable statute;
(c) Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;
(d) Pre-judgment interest as may be permitted by law and statute; and/or
(e) Such other and further relief as this court may deem just, proper, equitable, and appropriate.


Respectfully Submitted,


/s/ Eric J. Rosenberg
Eric J. Rosenberg (0069958)
Ellen L. Foell (0016382)
Rosenberg & Ball Co. LPA
395 North Pearl Street

Granville, Ohio 43023
740.644.1027 phone
866.498.0811 fax
erosenberg@rosenbergball.com
efoell@rosenbergball.com

## JURY DEMAND

Tyler Gischel hereby demands a trial by a jury in this matter.


/s/ Eric J. Rosenberg
Eric J. Rosenberg (0069958)